**Elis CINTRON et al., Plaintiffs,**

v.

**BRENTWOOD UNION FREE SCHOOL DISTRICT et al., Defendants.**

**No. 77–C–1370.**

United States District Court,
E. D. New York.

Jan. 10, 1978.

58

Puerto Rican Legal Defense & Education Fund, Inc., New York City, for plaintiffs; Robert Hermann, Barbara L. Schulman, Teitelbaum & Hiller, Herbert Teitelbaum, New York City, of counsel.

Pace & Pace, E. Islip, N. Y., for defendants; Richard C. Cahn, Huntington, N. Y., of counsel.

Memorandum of Decision

MISHLER, Chief Judge.

Puerto Rican and other Hispanic children who have deficiencies in the English lan-

guage bring this class action [1] for injunctive and declaratory relief claiming violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; § 204(f) of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1703(f); and the Civil Rights Act of 1871, 42 U.S.C. § 1983. The suit was filed in response to the announced intention of the defendant Brentwood Union Free School District (Brentwood) to restructure its bilingual program known as Project Avelino and substitute therefore its Plan V.[2]

In May and June, 1977, Brentwood terminated forty (40) elementary school teachers in accordance with the state court mandate in *Morris v. Brentwood Union Free School District, supra,* directing that dismissal be based on seniority. Fifteen (15) bilingual teachers having the least seniority and two (2) part-time bilingual teachers were dismissed; only seven (7) bilingual teachers were continued. Brentwood adopted Plan V as a method of providing bilingual education with the reduced teaching staff. Plan V was to become operative with the commencement of the school year in September, 1977. The court issued a temporary restraining order however, on August 22, 1977, directing a continuance of the bilingual program as it existed during school year 1976–1977.[3]

The issues were tried to the court without a jury. The court finds as follows:

The Brentwood school district (elementary and high school) has a student enrollment of about 19,000. It has a Hispanic student population of about 3,700. The elementary system has twelve schools with a student enrollment of about 10,000 including approximately 2,000 Hispanic students. A bilingual educational program has been offered for the past five years which is supplemented by an ESOL (English For Speakers of Other languages) program.

*PROJECT AVELINO*

The bilingual educational program started in the school year beginning in September, 1973, with the kindergarten class and first grade. In each successive year the program has expanded into the next grade, so that at the present time the bilingual program is offered from kindergarten to the fifth grade. It is expected that the program will continue to the sixth grade. Each year approximately 100 children enter the bilingual program as they enroll in kindergarten, while some students enroll in grades 1 and 2. Approximately 460 children currently participate in Project Avelino.

Under the program, which is offered to those whose dominant or exclusive language is Spanish, Hispanic students in kindergarten and the first grade are taught the subject matter of the curriculum in Spanish, while at the same time they are exposed to some English. As the students progress from year to year, the percentage use of English increases while the use of Spanish decreases. The increasing emphasis on English speaking in each successive year is expected to produce a level of language proficiency such that by the time the

1. The class consists of "all Puerto Rican and other Hispanic children who attend or will attend public school in the Brentwood Union Free School District and who have or may have deficiencies in their English language abilities which necessitate their receiving special language programs in order for them to participate effectively and equally in the schools' instructional process." [Order dated December 30, 1977]

2. In May, 1975, Brentwood terminated nine elementary school teachers who were no longer needed because of declining enrollment. The dismissed teachers brought an action in the state court claiming they were senior in tenure to the bilingual teachers and therefore their dismissal violated New York Education Law § 2510 which provides for dismissal of teachers "having the least seniority in the system within the tenure of the position abolished . . . ." Their position was sustained by the state court in *Morris v. Brentwood Union Free School District,* No. 75–8746, (New York Supreme Court, Suffolk County Aug. 14, 1975), *aff'd,* 52 App. Div.2d 584, 383 N.Y.S.2d 542 (2d Dept. 1976), the court holding that there is a single tenure area which included bilingual teachers.

3. Brentwood consented to the extension of the T.R.O. until final determination of the issues after trial on the merits.

student reaches the sixth grade, all courses can be taught entirely in English.

A bilingual teacher and aide teach all substantive courses, and give individual attention to those students within the class who have a greater capacity to absorb English instruction. Beyond the substantive courses, Hispanic students also receive instruction in the history and culture of their countries of origin, i. e., Puerto Rican children are taught the history and culture of Puerto Rico, children of Colombian parents are taught the history and culture of Colombia, etc. Only art, music, physical education, and other specialty subjects are taught exclusively in English. Specialty instructors relieve the bilingual teachers during such periods.

The bilingual program segregates the Spanish speaking students from the rest of the student body. The children remain in the same classroom except for physical education and lunch. Yet, during lunch hour and physical education period, they tend to continue as the same identifiable Spanish speaking group. Moreover, students who have attained the level of proficiency in English which would permit learning in the English language are nevertheless retained in the program for the purpose of maintaining their Spanish cultural level. No student has been transferred from the bilingual program to the regular English curriculum in the history of Project Avelino.

*PLAN V*

Under Plan V, seven elementary schools in the district would offer an ESOL center run in substantially the same manner as under Project Avelino, and a Spanish basic skills room for remedial help and cultural instruction. Hispanic students in the bilingual program would spend the majority of the school day in the homeroom with English speaking students where substantive courses (i. e. reading, math, and social studies) would be taught in English. Non-English speaking students would also be required to attend the Spanish basic skills room for periods ranging from one-half hour to one and one-half hours depending upon the student's English comprehension level. Bilingual teachers there would offer remedial help by explaining in Spanish the subject matter covered in the monolingual homeroom. Cross-cultural studies and basic language arts (i. e. Spanish language, literature and comprehension) would also be taught in the basic skills room. From the third grade up students would be instructed in the Puerto Rican cultural inheritance.

The basic skills room is described as a potpourri of various teaching methods including mechanical teaching devices such as tape recordings and audio-visual aids. Groupings of kindergarten, first and second grade, third and fourth grade, and fifth grade students, never exceeding twenty in number, would be scheduled to assemble there each period. While the majority of students would receive cross-cultural or language art instruction from bilingual teachers, the aide might devote her attention to three or four students who needed remedial help in the substantive courses covered in the English homeroom.

The school board estimates that under Plan V, each bilingual teacher and aide will teach nine half-hour periods. Each day, kindergarten students would be slotted for one half-hour in the morning or one half-hour in the afternoon; first and second graders for three half-hour periods; third and fourth graders for one half-hour period plus an extra time period; while fifth graders will have the option of attending the one half-hour period assigned to fourth graders or specially designated "extra help classes." No maximum limit is placed on the time that a student might attend the basic skills room; the only limitation imposed is the class size. But, a child who attends during a period for which his class is not scheduled runs the risk of finding himself or herself at a significantly different level of instruction.

*Identification of Students for Bilingual Instruction* (Under Project Avelino and Plan V)

Students who have English language deficiencies are identified at Kindergarten

registration by a Spanish speaking social worker or psychologist. When an entrant requiring help is identified, the problem is discussed with the parent. The parents have the option of choosing a class taught in English, an ESOL program or a bilingual program. No reliable method, however, is used to identify students in the upper school grades who have English language deficiencies. It now depends on the awareness of the classroom teacher who might find that a child is *underachieving* because of an English language deficiency. Plan V would not significantly change the method of identifying kindergarten students having difficulties in the English language.

Though achievement tests are administered at all grade levels, and a uniform test (New York State Evaluation Program) is given every third, sixth and ninth grade student, no language test is administered to evaluate the scores in the light of possible English language deficiencies. On the other hand, Brentwood has tested students in the bilingual program to determine their English language skills, and it found that fifty three (53) of those enrolled in the program were able to function adequately in classes where the instruction was totally in English.

## DISCUSSION

In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) non-English-speaking Chinese students brought a class action against the school district claiming a Four-

teenth Amendment violation in failing to provide equal educational opportunities. In reversing the denial of relief by the lower courts, the Court did not reach the Equal Protection issue, but remanded, pursuant to § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d [4], with a direction to fashion appropriate relief.

The Court defined the obligation of the school district by reference to clarifying guidelines issued by H.E.W. in 1970 requiring the school district to take affirmative steps to rectify the problems of language deficient students so that they might participate as fully as English speaking students in the educational opportunities offered.[5]

Apparently spurred by the Court's pronouncement in *Lau*, the Congress explicated the obligation of the state to provide an effective bilingual educational program in the enactment of § 204(f) of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1703(f); it provides that:

No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

(f) the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs.

In *Morales v. Shannon*, 516 F.2d 411, 415 (5th Cir. 1975) [6] the court observed that "[i]t

4. § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d provides that:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

5. In 1968, H.E.W. issued regulations pursuant to the authority of § 602 of the Act, 42 U.S.C. § 2000d–1. The clarifying regulations published in 1970 in 35 Fed.Reg. 11595 provided in pertinent part:

Where inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program of-

fered by a school district, the district must take affirmative steps . . . in order to open its instructional program to these students.

Any ability grouping or trading system employed by the school system to deal with the special language skill needs of national origin-minority group children must be designed to meet such language skill needs as soon as possible and must not operate as an educational deadend or permanent track.

6. H.R.Rep.No. 93–805, 93rd Cong. 2nd Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News., p. 4093 noted that "[t]he recent Supreme Court decision, *Lau v. Nichols,* which was handed down on January 21, 1974 underscores the need for a continuing Federal com-

is now an unlawful educational practice to fail to take appropriate action to overcome language barriers."

H.R.Rep.No. 93–805, 93rd Cong., 2nd Sess. *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 4093, 4148 describes the Congressional understanding of bilingual education as involving,

> . . . the use of two languages, one of which is English, as the media of instruction in a comprehensive school program. There is evidence that use of the child's mother tongue as a medium of instruction concurrent with an effort to strengthen his command of English acts to prevent retardation in academic skill and performance. The program is also intended to develop the child's self-esteem and a legitimate pride in both cultures. Accordingly, bilingual education normally includes a study of the history and cultures associated with the mother tongue.

These congressional observations and findings were supported by expert opinion in *Serna v. Portales Municipal Schools*, 499 F.2d 1147, (10th Cir. 1974) which discussed the psychological trauma visited upon non-English speaking students attending a class instructed in the English language. The court found evidence

> . . . that when Spanish surnamed children come to school and find that their language and culture are totally rejected and that only English is acceptable, feelings of inadequacy and lowered self esteem develop. . . . If a child can be made to feel worthwhile in school then he will learn even with a poor English program. . . . [C]hildren who are not achieving often demonstrate both academic and emotional disorders. They are frustrated and they express their frustration in lack of attendance, lack of school involvement and lack of community involvement. Their frustrations are reflected in hostile behavior, discipline

problems and eventually dropping out of school.

The legislative enactment of which § 204(f) of the Equal Educational Opportunity Act of 1974 is but a part, *i. e.*, Pub.L. 93–380 (Title II) amended the Elementary and Secondary Education Act of 1965 by adding thereto the Bilingual Education Act of 1974, 20 U.S.C. § 880b *et seq.* The Congress under Section 105(a)(1) of the Act, 20 U.S.C. § 880b, recognized "that a primary means by which a child [of limited English speaking ability] learns is through the use of such child's language and cultural heritage" [(a)(3)], and declares it to be the policy of the Congress "to provide financial assistance to local educational agencies . . . to develop and carry out such programs . . . which are designed to meet the educational needs of such children."

The Court's definition of the rights of non-English speaking students to receive an education equal to that of English speaking students and the obligation of school districts receiving federal financial aid to nurture them to fruition, prompted H.E.W. to prescribe guidelines for their implementation. In the summer of 1975, the Office for Civil Rights of H.E.W. issued a memorandum entitled "Task Force Findings Specifying Remedies Available for Eliminating Past Educational Practices Ruled Unlawful Under *Lau v. Nichols*". The memorandum is commonly known as the "Lau Guidelines." The guidelines are entitled to great weight, *Lau v. Nichols, supra.*

The bilingual plan prescribed under the Lau Guidelines requires the school district to (1) assess the language ability of the student; (2) identify the nature and extent of the students educational needs and utilize the most effective teaching style to meet those needs; (3) implement the type of educational programs dependent upon the degree of linguistic proficiency of the

---

mitment to bilingual education." The report was " . . . cognizant that the landmark *Lau v. Nichols* decision will have far reaching

ramifications for all of the school systems serving children whose native tongue is other than English *id.* at 4150–51."

students in question [7]; and (4) train bilingual teachers.[8]

### Where Project Avelino Fails to Meet Statutory & Regulatory Standards

Project Avelino as administered under Mrs. Nigda Nin Brasch is violative of 204(f) of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1703(f), and the "Lau Guidelines." Mrs. Brasch conceded that in Project Avelino, Spanish speaking students are kept separate and apart from English speaking students in music and art in violation of the "Lau Guidelines," [9]

Mrs. Brasch deliberately conducted Project Avelino as a maintenance program and discouraged transfer out of the program. She failed to provide a mechanism for removing students who reached the level of proficiency in the English language which would enable them to understand regular English instruction. Fifty-three students were retained in Project Avelino after it had served its mandated objective.[10] To that extent the administration of the bilingual program was a perversion of the purpose and a misuse of funds.[11]

### Deficiencies in Plan V

The manner of identifying students who are deficient in the English language is not clearly indicated in the plan. Defendants represented that the same method of assessing English language capability used under Project Avelino will be retained.

The underlying theory of Plan V is an immersion into English language and culture and a subordination of Spanish and Hispanic culture with a view towards accelerating the acquisition of English. This theory overlooks the declaration of policy and the findings of the Congress as embodied in Section 105(a)(1) of the Bilingual Education Act, 20 U.S.C. § 880(b), the statutory right of the non-English speaking child recognized under section 204 of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1703, Section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the teaching of Lau, and the suggestions of the Lau guidelines promulgated for the purpose of demonstrating methods of compliance with statutory and decisional requirements. Plan V is unacceptable. While integration is encouraged, there is no assurance that language deficient children in the upper grades will be identified. If they are, there is the continued threat of insufficient remedial assistance. For if a child cannot comprehend principles of math or science taught in the English homeroom, he will not be able to explain his or her problem to the bilingual teacher in the Spanish basic skills room who is expected to provide remedial help. Moreover, children continually in need of remedial assistance, who might spend more time in the basic skills room than they are scheduled for, run the risk of missing planned instruction thus further retarding their educational progress.

7.  For example where the elementary student speaks only Spanish any one of the following programs is acceptable.
    1. Transitional Bilingual Education Program (TBE)
    2. Bilingual/Bicultural Program
    3. Multilingual/Multicultural Program
    Bilingual/Bicultural Program is defined as:
    "A program which utilizes the students' native language (example: Navajo) and further develops all the necessary skills in the students' native language and culture while introducing, maintaining and developing all the necessary skills in the second language and culture (example: English). The end result is a student who can function, totally in both languages and cultures."

8.  The Lau Guidelines are appended to this memorandum of decision.

9.  "In such courses or subjects of study as art, music, and physical education a program of

bilingual education shall make provision for the participation of the children of limited speaking ability in regular classes." § 123.02 subd. G2(2).

10. The determination is based on the results of a test given periodically in May or June and September to all students in the program to assess progress in the English language.

11. Section 204(a) of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1703(a) provides that
    "No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—
    (a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools."

*Disposition*

Brentwood is directed to submit a plan in compliance with the Lau Guidelines. The requirements permit latitude in organizing a bilingual program. The task is not an easy one. The goal is instruction by competent bilingual teachers in the subject matter of the curriculum while at the same time teaching non-English-speaking children the English language. The time limitation of the school day is an obstacle that may be overcome by supplementary programs designed to achieve both goals. Extra curricular activities conducted after the school day or during the summer period involving both English and non-English-speaking children comes to mind. Educating the parents of non-English-speaking children of the need to acquire proficiency in the English language [12] is a program that might be incorporated into the plan.

█ The plan must contain more specific methods for identifying on admission those children who are deficient in the English language and for monitoring the progress of such children by the use of recognized and validated tests to ascertain achievement levels and proficiency in the English language. It should have a training program for bilingual teachers and bilingual aides.[13] The program must be both bilingual and bicultural. It must provide a method for transferring students out of the program when the necessary level of English proficiency is reached. It should not isolate children into racially or ethnically identifiable classes, but it should encourage contact between non-English and English speaking children in all but subject matter instruction (in the earliest classes *i. e.*, kindergarten and first grade, where subject matter is of lesser importance, the program should emphasize the need for contact between non-English and English speaking children).

---

12. The Bilingual Education Act of 1974, 20 U.S.C. § 880b *et seq.* implicitly invites school districts to use innovative and imaginative programs to accomplish the declared purpose of the Act.

In the meantime Brentwood is directed to modify Project Avelino in accordance with this memorandum of decision and consistent with the best interests of the non-English speaking children.

This memorandum of decision contains the findings of fact and conclusions of law required under Rule 52.

Settle judgment in accordance with this memorandum of decision on five days notice by personal service (eight days by mail). The Court will hold a hearing on the provisions of the judgment.

---

13. The Lau Guidelines do not require that bilingual teachers or aides be Hispanic or Puerto Rican as Mrs. Brasch urges (such a requirement might very well offend the constitutional rights of teachers of other ethnic backgrounds) but rather that they be "linguistically/culturally familiar with the background of students."