**Inez GIVENS, et al., Plaintiffs,**

v.

**DELTA ELECTRIC POWER ASSOCIATION, et al., Defendants.**

**Civ. A. No. GC83–171–WK–O.**

United States District Court,
N.D. Mississippi,
Greenville Division.

Sept. 27, 1983.

Solomon C. Osborne, North Mississippi
Rural Legal Services, Greenwood, Miss., for
plaintiffs.

Joe H. Daniel, Daniel, Coker, Horton &
Bell, P.A., T. Hunt Cole, Jr., Miller, Milam,

Johnson & Moeller, Jackson, Miss., Hardy, Lott, Lott, Sanders & Fonda, Greenwood, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, District Judge.

In this civil action brought under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, black plaintiffs Inez Givens, Mildred Cain Burks, Leroy Carter, Samuel Childress, Lin Earl Collins, Solomon C. Osborne, Levester Peacock, Eddie Scales, George Stansberry, and an as yet uncertified class of similarly situated individuals, sue defendants, Delta Electric Power Association (DEPA), its directors, general manager, and secretary-treasurer, alleging deprivation of their right, because of race, as members of the cooperative, to participate meaningfully in the election of DEPA's board of directors. Plaintiffs further allege that they and other black members of DEPA have been discriminated against through DEPA's disparate treatment of black and white members with regard to collection, cutoff and reconnection policies, unequal rate charges, and an allegedly racially motivated street-light policy. The Court has for decision defendants' motion for partial summary judgment on plaintiffs' allegations concerning "disparate service," and also defendants' Fed.R.Civ.P. 12(b)(1) motion to dismiss plaintiffs' Title VI claims for lack of standing, or alternatively, for partial summary judgment on the Title VI issues. We emphasize that defendants' motions do not encompass plaintiffs' discrete allegations that their right to participate meaningfully in DEPA's election process was unlawfully denied because of race.

### I. *Section 1981 Claims*

We first address defendants' Rule 56 motion on plaintiffs' allegations under § 1981 that relate to "disparate services" provided to its members by DEPA. In our August 11, 1983, order, we held that plaintiffs' allegations were sufficient to state a § 1981 claim for relief, in reliance upon *Cody v. Union Electric,* 518 F.2d 978, 979 (8th Cir.

1975). The merits of those allegations, of course, were not then addressed.

For summary judgment to be appropriate, the moving party must demonstrate that no genuine issue exists as to any material fact. "Summary judgment may be granted only when the moving party has established his right to judgment with such clarity that the nonmoving party cannot recover ... under any discernible circumstance." *Everhart v. Drake Management, Inc.,* 627 F.2d 686, 690 (5th Cir.1980).

In support of their position, defendants have submitted the deposition testimony of all nine of the named plaintiffs, each of whom, with the exception of Levester Peacock, conceded that they knew of no instances where DEPA had practiced racial discrimination in providing or refusing to provide electrical services; indeed, most plaintiffs stated that their only complaint with DEPA was in regard to the election of directors. (Burks Dep., at 32–33; Carter Dep., at 96–97; Childress Dep., at 70; Collins Dep., at 38–39; Givens Dep., at 67; Osborne Dep., at 14–15; Scales Dep., at 77–78 (plaintiff Scales does, however, make the charge that he believes streetlights were cut off in black neighborhoods for discriminatory reasons, though no supporting evidence is offered by him); Stansberry Dep., at 30–31). Peacock, in his deposition, states that it was his opinion that the electrical service of a black member would be terminated more readily for nonpayment than would a white's. However, this testimony is hardly supportive of the claim since Peacock is unable to cite any instance of a similarly circumstanced white DEPA member being given an extension of time within which to pay before termination of electrical service. (Peacock Dep., at 54–60).

Responding to defendants' Rule 56 motion, plaintiffs have submitted in support of their allegations the affidavits of Solomon and Deborah Osborne, Freddie Veal and George Stansberry, and the depositions of plaintiffs Peacock, Scales and Childress. Evidence is offered on two specific aspects of the "disparate services" claim: (1) unduly harsh termination of black members'

service, and (2) the allegedly racially motivated cutoff of streetlights in Rising Sun subdivision.

As support for the charge of unduly harsh termination, the Osbornes state that notwithstanding DEPA's declared policy that electrical service will not be terminated until electric bills are ninety days past due, (see Bonner Dep., at 29–30), their service was terminated before expiration of such time. (S. Osborne Affidavit, ¶ 3; D. Osborne Affidavit, ¶¶ 2–3). As noted, Peacock's testimony is in substantial agreement with that of the Osbornes. Peacock further stated that the electric service of his sister, Christine Zachary, was also terminated in a discriminatory manner. (Peacock Dep., at 50–56).[1] Freddie Veal also alleges that his service was cut off prior to expiration of the ninety-day period. (Veal Affidavit, ¶ 2). Veal stated that his request for an extension was denied. *Id.* In further support of the disparate services allegations, plaintiff Stansberry contends that his service was cut off after his check in payment of his past due electric bill was dishonored by the bank for insufficient funds. Stansberry stated that, "I feel that if I had been white I would have been contacted and told the check was returned before my services were disconnected. . . ." (Stansberry Affidavit, ¶ 2).

Defendants do not deny that the electric service of the above-mentioned black members was terminated; however, they vigorously contest, and we believe successfully defeat, plaintiffs' conclusory allegations that service was terminated in violation of DEPA's stated policy. Plaintiffs rely on a small excerpt from H.H. Bonner's deposition, taken out of context, to establish the "ninety day" termination policy which they contend was not followed in their particular cases. Bonner's full explanation of that policy was as follows:

BY MR. OSBORNE:

Q. What is the policy with respect to [disconnecting people for non-payment of their utility bills]?

A. The policy is that we will mail the member-customer a bill. If he does nothing about paying that bill, and let's assume that is his first bill that he received after receiving service from us, and he does nothing about paying that bill, we do absolutely nothing. The following month we send him another bill. To that bill, if he has not paid the first bill, we staple to the bill a notice advising him that if the bill is not paid within a certain number of days, service will be disconnected because he didn't pay it. We don't do anything then, because we're not physically able to do that. We wait until we read the meter for the third month's billing. The customer is then 90 days delinquent.

(Bonner Dep., at 29–30).

In his supplementary affidavit, Bonner denied that race played any part whatsoever in the decision to terminate services, and further explained that the term "delinquent" as used in his deposition testimony, *supra,*

means days of unpaid electricity as measured from the first day of the first billing period for which the customer's bill was not paid until date of disconnect. It does not mean 90 days as measured from the gross due date of the first month's unpaid bill to the day of disconnect. From a billing standpoint, electricity is not cut off for nonpayment until the customer has not paid the bills for two months and the meter is being read for the third month. . . .

(Bonner Supp. Affidavit, ¶ 3). While Bonner's earlier deposition testimony is less than clear, the above explanation is entirely consonant with DEPA's written termination policy. That policy states that a customer is delinquent, and that his service will be terminated without further notice,

---

**1.** Under Fed.R.Evid. 801–802, Peacock's assertions of what his sister told him regarding the termination of her electric service is inadmissible hearsay. Evidence that would be inadmissible at trial, such as hearsay, cannot be used

to avoid summary judgment. *See, e.g., Barker v. Norman,* 651 F.2d 1107, 1129 (5th Cir.1981); *Broadway v. City of Montgomery,* 530 F.2d 657, 661 (5th Cir.1976); Fed.R.Civ.P. 56(e).

when he owes two months' bills, and the meter is being read for the third month. (Exhibit A, ¶ IV, Bonner Supp. Affidavit).

■ Viewing the evidence in the light most favorable to the nonmoving parties, as we must, plaintiffs' terminations do not fall outside of defendants' written policy. The equal implementation of the written policy is not contradicted by any evidence of plaintiffs; Osborne's service was cut off with two months' bills unpaid, 93 days after commencement of the first month's billing cycle; Veal's service was discontinued four times in 1982 and 1983, every time with two months' bills in arrears, 95, 94, 94, and 97 days respectively after commencement of the first month's billing cycle; Stansberry's service was terminated twice in 1981, each time with two months' bills past due, 102 days after commencement of the first month's billing cycle; Zachary's electricity was cut off twice in 1982, 92 and 96 days respective after commencement of the first month's billing cycle. Zachary's service was likewise terminated with two months' bills outstanding. The record reveals that Peacock did not become a DEPA member until March 1983, and that his power has not been cut off since that time.[2] (Exhibit C, Bonner Supp. Affidavit).

■ These cutoff dates are not disputed by plaintiffs; rather, they argue that they were entitled to ninety days after receipt of the first month's unpaid bill before termination. As conclusively borne out by the uncontroverted Bonner deposition and supplementary affidavit, such is not DEPA's established policy. Significantly, plaintiffs have made no showing of the existence of a cutoff policy or custom contrary to the one in writing, and as explained by Bonner. Moreover, the record is devoid of any evidence which would support plaintiffs' claims that DEPA's termination policy is applied harshly or unfairly, or that white members are treated in a different manner. Conclusory allegations of race discrimination without a minimal factual showing are insufficient to raise a factual issue. As the Fifth Circuit has held, "once the moving party has properly supported his summary judgment motion, the nonmoving party must rebut with '*significant probative*' *evidence.*" *Ferguson v. National Broadcasting Co.,* 584 F.2d 111, 114 (5th Cir.1978) (citing *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)) (our emphasis).

■ As for Stansberry's contention that his service was cut off upon return of his insufficient funds check without notice because he is black, we again look to DEPA's written policy, which declares that customer accounts will be cut off without further notice when the customer's check for two months' service is returned unpaid by the bank. (Exhibit A, ¶ II(2), Bonner Supp. Affidavit). Again, no evidence has been offered which in any way supports plaintiff Stansberry's "feeling" that a white member would have received different treatment. Therefore, this assertion, like those of Osborne, Veal, Zachary and Peacock, must also fail.

We turn next to plaintiffs' allegation that streetlights in the Rising Sun subdivision, a black neighborhood near Greenwood, have been disconnected, while streetlights in white neighborhoods have been left burning. In support of this claim, plaintiffs have submitted Solomon Osborne's affidavit and the deposition testimony of Eddie Scales and Samuel Childress. These declarants represent only that some of the streetlights in the Rising Sun area have been cut off (S. Osborne Affidavit, ¶ 4; Scales Dep., at 75–77; Childress Dep., at 24–25, 126–28, 141–43, 150–54), coupled with their wholly unsubstantiated opinion that the discontinuance of full streetlight service was racially motivated. (Scales Dep., at 75–76; Childress Dep., at 126). Plaintiffs' only personal knowledge in this regard is their observation that the streetlights in several predominantly white neighborhoods near Green-

---

2. Although the record is unclear, Peacock apparently received electrical service through a DEPA membership listed in the name of his father, Willie Peacock, prior to becoming a member himself in March 1983. (*See* Peacock Dep., at 51–52).

wood are all on, at times when several streetlights in Rising Sun subdivision are off. Plaintiffs freely admit, moreover, their lack of personal knowledge as to the method of payment for streetlight service in Rising Sun and other subdivisions. (Scales Dep., at 16–17, 75–77; Childress Dep., at 24–25, 118–19, 126–27). In the face of factual evidence that contradicts the claim of discrimination in streetlight service, mere speculation alone cannot defeat defendants' summary judgment motion.

■ To refute the alleged discrimination, Bonner discusses at length DEPA's policy regarding streetlight service, none of which is contradicted by any evidence before the Court. In his supplementary affidavit, Bonner explains that the developer of Rising Sun subdivision provided free streetlights until the mid-1970's. When the developer discontinued this service due to rising energy costs, DEPA stepped in and provided full streetlight service to Rising Sun free of charge. One-half of these lights were later disconnected as an economy measure. Bonner asserts that race played no part in the decision to disconnect, and the facts support this assertion.

DEPA currently provides electricity free of charge to approximately twenty-nine lights in Rising Sun and individual Rising Sun residents pay for fourteen other lights. Bonner states that, "[i]n this regard, the Rising Sun Subdivision receives more favorable treatment than any commercial residential development served by Delta EPA." (Bonner Supp. Affidavit, ¶ 5). Bonner further states that in the predominantly white Johnson, Fairfield and Longacres subdivisions near Greenwood served by DEPA, individual member-consumers are billed for

and pay the monthly charges for *all* streetlights receiving electricity. As for the other white subdivisions in the area, Burns, Glendale and Twin Rivers are served by City of Greenwood Utilities, and not by DEPA, and Lakeview is served in part by City of Greenwood Utilities and in part by Mississippi Power & Light Co. (Bonner Supp. Affidavit, ¶ 6).

As noted, where a summary judgment motion has been properly supported under Fed.R.Civ.P. 56(e), the burden shifts to the opposing party to rebut with "significant probative" evidence. *Ferguson,* 584 F.2d at 114; *see also Broadway v. City of Montgomery,* 530 F.2d 657, 659–60 (5th Cir.1976) (same).

In the case *sub judice,* plaintiffs have wholly failed to come forward with any probative evidence to support the disparate services allegations in their complaint. Mere recitation of the facts that some plaintiffs' electricity was cut off and that some streetlights in the Rising Sun neighborhood have been disconnected is insufficient to support claims of racially motivated disparate treatment with regard to electrical service where defendants have produced uncontradicted evidence fully explaining DEPA's account cutoff and streetlight disconnection policies. Further, the only probative evidence before the Court supports defendants' assertions that DEPA complied with these policies in a neutral manner in each instance cited by plaintiffs. Plaintiffs have utterly failed to demonstrate that a genuine issue exists as to any material fact, and therefore summary judgment in favor of defendants is appropriate with regard to plaintiffs' disparate services claims.[3]

---

**3.** We wish to emphasize that we address only those claims of plaintiffs which can be accurately characterized as relating to disparate electrical *service.* A large portion of plaintiffs' brief in response to this summary judgment motion is directed to the issue of unequal membership opportunities, including, but not limited to, the election of directors. In the category of membership opportunities, the court includes plaintiffs' allegations that disproportionately high membership fees have been charged black members, *see* Peacock Dep., at 51–53 ($75 versus $5); Osborne Affidavit, August 11, 1983, at

6 ($50 to $75), and that in some instances DEPA has refused to transfer the membership from the name of a deceased relative or divorced spouse to the actual consumer. (*See* Childress Dep., at 132–36). In the same vein, plaintiffs have also alleged that some white DEPA board members have denied black tenants on their plantations the right to DEPA memberships in their own names, even though the black tenants are the ones who actually receive and pay for electrical service. (Meyer Dep., at 5–6; Morgan Dep., at 16–18; Waterer Dep., at

## II. *Title VI Claims*

■ We next address defendants' challenge to plaintiffs' Title VI claims for lack of standing. The Supreme Court only recently discussed the prerequisites for bringing suit under Title VI in *Guardian Association v. Civil Service Commission,* —— U.S. ——, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1980). Although the many separate opinions filed in that case "further confuse rather than guide," —— U.S. at ——, 103 S.Ct. at 3235, 77 L.Ed.2d at 885 (Powell, J., concurring), we assume, as does the plurality, that a private right of action for declaratory and injunctive relief is cognizable under Title VI. —— U.S. at ——–——, 103 S.Ct. at 3227–3229, 77 L.Ed.2d at 876–78; *see also Cannon v. University of Chicago,* 441 U.S. 677, 694–703, 99 S.Ct. 1946, 1956–1961, 60 L.Ed.2d 560 (1979) (applying four factors of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in holding that private cause of action exists under Title IX; Title IX derived from Title VI, and Congress understood that private remedies were available under Title VI); *Regents of the University of California v. Bakke,* 438 U.S. 265, 281–84, 328, 98 S.Ct. 2733, 2743–45, 2767, 57 L.Ed.2d 750 (1978) (four Justices assumed, but did not decide, that private action was available under Title VI); *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (relief given to private plaintiffs in Title VI action, where existence of private cause of action not disputed).

Defendants contend, however, that these particular plaintiffs are not entitled to maintain a private action under Title VI for lack of a sufficient nexus between the federal funds received by DEPA and the discrimination allegedly suffered by the plaintiffs. In *Brown v. Sibley,* 650 F.2d 760 (5th Cir.1981), where an action was brought under § 504 of the Rehabilitation Act of 1973,

29 U.S.C. § 794 (Supp. III 1979), the Fifth Circuit expressly relied upon Title VI principles, 650 F.2d at 768–69, in holding that for a private plaintiff to assert a claim, more is required than

> simply to show that some aspect of the relevant overall entity or enterprise receives or has received some form of input from the federal fisc. *A private plaintiff . . . must show that the program or activity with which he or she was involved, or from which he or she was excluded, itself received or was directly benefitted by federal financial assistance.*

650 F.2d at 769 (our emphasis).

■ It is undisputed that the only federal funding which is received by DEPA, and which could thus trigger plaintiffs' Title VI claims, are low-interest loans made by the Rural Electrification Administration (REA) pursuant to the Rural Electrification Act, 7 U.S.C. § 902. As stated by the Act the purpose of these loans is to assist in "the furnishing of electric energy to persons in rural areas who are not receiving central station service." *Id.* Plaintiffs have been unable to rebut defendants' proof that the REA loan funds are used by DEPA for any purpose other than constructing, operating and upgrading its electrical distribution system.[4] Plaintiffs rely solely on the statement of director Rex Morgan that loan funds are used by DEPA for all operational purposes to support their Title VI attack on DEPA's electoral scheme. (Morgan Dep., at 19–20). The overwhelming weight of evidence shows otherwise, however. We place especial emphasis on the unrebutted testimony of H.H. Bonner, Secretary-Treasurer and Chief Financial Officer of DEPA, that REA funds are not used for DEPA's internal operations, believing that he is in the best position to know the true use of any such monies. (Bonner Affidavit of August 17, 1983, ¶¶ 1–7; *see also* Arant Dep.,

---

34–35). Defendants have not moved for summary judgment on these claims and our grant of summary judgment today therefore does not encompass them; further, since these claims are not now under review, we do not address possible hearsay objections to the assertions of Peacock, Childress and Osborne.

4. Plaintiffs bear the burden of proof in defeating a factual attack on subject matter jurisdiction. *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).

at 27; Ely Dep., at 30; Branch Dep., at 18–19).

In our August 10, 1983, bench ruling and August 11, 1983, order, we held that plaintiffs had standing to assert a private right of action against DEPA under Title VI with respect to their disparate services claims, concluding that as users and consumers of DEPA, plaintiffs were directly affected by the construction, operation and maintenance of DEPA's electrical distribution system. The Court held, without reaching the merits, that plaintiffs' allegations of harsh collection, cutoff and reconnection policies were sufficiently related to DEPA's use of federal funds to allow plaintiffs to proceed on their Title VI claims. However, as discussed above, the Court now concludes that plaintiffs' allegations of disparate service are unsubstantiated in fact and, as such, are without merit. Consequently, plaintiffs' reliance on claims of disparate service can no longer support standing to sue under Title VI.

 Finally, we conclude that plaintiffs' charges that black consumers have been discouraged from obtaining DEPA memberships in their own names, see supra note 3, are not sufficiently related to DEPA's receipt of REA construction and operation funds to confer standing under Title VI. Such claims do not go to the actual service received by the DEPA consumer, as we have previously held they must, since there is no allegation, beyond those disposed of above, that such consumers were discriminated against in any manner related to the construction, operation or upgrading of DEPA's distribution system. Instead, these claims are grounded upon an alleged denial of the right to vote in DEPA elections, and, as such, are more properly considered under 42 U.S.C. § 1981, along with plaintiffs' objections to the April 12, 1983, annual meeting and related events. Plaintiffs have failed to show any connection between the funds received by DEPA from the federal fisc and the alleged "membership" deprivations, as required by Brown v. Sibley; therefore, these particular private plaintiffs lack standing to pursue these claims under Title VI, and therefore defendants' motion to dismiss plaintiffs' Title VI claims should be sustained.

To summarize our ruling, we hold that partial summary judgment should be granted to defendants on plaintiffs' claims of disparate services, more specifically, that defendants discriminated against black members in account cutoffs or in discontinuance of streetlight service. We further hold that plaintiffs' Title VI claims should be dismissed for lack of standing. Our ruling today does not encompass any of plaintiffs' § 1981 claims related to the exclusion of black consumers from DEPA membership or the election of DEPA directors.

Let an order issue accordingly.