OPINION OF THE COURT
Kristin Booth Glen, S.
*1025 This is an uncontested proceeding by an administrator for permission to resign and for the appointment of a successor administrator. The decedent was a three-year-old girl who died tragically in a fire later attributed to arson. Although initially the decedent’s older sister was appointed administrator, she wishes to resign and asks the court to appoint decedent’s father, Domingo Toribio, as successor administrator. Mr. Toribio speaks, reads and writes in Spanish only.
In purely formal legal terms, the question presented is the qualification of the proposed administrator de bonis non, given SCPA 707 (2) which provides that a court may declare a person unable to read and write the English language ineligible to act as a fiduciary. The larger question is whether and how, in our multicultural, multilingual society, courts are obligated to maximize and facilitate participation in the justice system.[1]
The relevant statute provides no guidance as to when or how the court is to exercise its discretion, nor, significantly, where the burden, if any, lies.[2] What little case law exists suggests that the statute was directed more at illiteracy than at English language competence, and that illiteracy stood as an uneasy proxy for that “want of understanding” which clearly disqualifies a person from serving as an administrator pursuant to SCPA 707 (1) (e) (see Matter of Pugarelli, 10 Misc 2d 456, 460 [Sur Ct, Richmond County 1958] [finding illiterate widow eligible to act as administrator because “(t)he experience of the court has been that there is no correlation between intelligence and education”]). The statute has also been extended, however, to proposed fiduciaries who were unable to read and write not due to “want of understanding” but because of physical disabilities (Matter of Santoro, 18 Misc 2d 980 [Sur Ct, Nassau County 1959] [disqualifying blind surviving spouse because her inability to read or write would require delegation of her duties to a third party not within the control of the court]).
It is not surprising that the reported cases under SCPA 707 (2) are decades old; we have experienced a sea change in our view of disability (evidenced, for example, by the passage in 1990 of the Americans with Disabilities Act, 42 USC § 12101 et *1026 seq.) and, more relevant here, in our view of immigrants and others who lack English language competence. Since those early cases were decided, federal legislation and later case law have removed many obstacles to participation by non-English-speaking persons in the institutions of our democratic society, such as voting, public education, and social services. Jurisdictions covered by the Voting Rights Act of 1965 (42 USC § 1973aa-la [c]), for example, must provide access to bilingual ballots for language minorities. The Supreme Court in Katzenbach v Morgan (384 US 641 [1966]) observed that Congress properly enacted that law to prohibit discrimination against persons schooled in Puerto Rico that denied them the right to vote based on language ability, ending the use of New York State literacy tests as applied to those voters. In Lau v Nichols (414 US 563 [1974]), the Court held that title VI of the Civil Rights Act of 1964 guarantees public educational opportunities to limited English proficient students. The Department of Health and Human Services has issued guidelines for various health care facilities and family programs that receive its assistance to provide language support services to insure “meaningful access” for “limited English proficient” persons (68 Fed Reg 47311, 47313 [2003]).[3]
New York State has demonstrated similar concern for providing access to and participation in voting,[4] education,[5] and health *1027 care.[6] If anything, New York City has demonstrated even greater understanding of both the importance and needs of immigrant and non-English-speaking communities. New York City statistics suggest why.[7] As of the most recent census, 36% of the population was foreign born,[8] and nearly 43% of those were recent entrants, defined as those entering within the past 10 years. New Yorkers speak a plethora of languages. In Queens County alone, approximately 138 languages are spoken[9] and children in all of New York City public schools speak nearly 170 languages at home.[10]
Immigration has reshaped the ethnic composition of the city. According to its Department of City Planning, “in just 30 years, what was primarily a European population has now become a place with no dominant race/ethnic or nationality group. Indeed, New York epitomizes the world city.”[11] The immigrant and non-English-speaking population has also added immeasurably to the city’s cultural and economic vitality.[12] As noted by the New York City Department of City Planning,
“Given the high level of out-migration from New York, immigrant flows mitigated catastrophic *1028 population losses in the 1970s, stabilized the city’s population in the 1980s, and helped the city reach a new population peak of 8 million by 2000 . . . “Immigrants also play a crucial role in the city’s labor market, comprising 43 percent of all city residents in the labor force in 2000 . . .
“Immigrants have also helped maintain the city’s housing stock.”[13]
Recognizing language issues presented by this large and vibrant immigrant population, New York City mayors have signed a variety of executive orders, including Executive Order (Bloomberg) No. 120 (July 22, 2008), mandating all city agencies that provide direct public services to create language implementation plans to ensure meaningful access to their services. To facilitate access to the precious civic responsibility of voting, the New York City Board of Elections provides voter registration and ballots in Chinese, Spanish, and Korean, as well as English.[14]
The courts have no less responsibility to serve all those within their jurisdiction, with language no barrier to our justice system. Indeed, in 2006, the New York State Unified Court System unveiled its plan to address the language needs of litigants in New York entitled Court Interpreting in New York: A Plan of Action.[15] At present, the Office of Court Administration employs over 300 staff interpreters in 30 languages (including sign language) and maintains a list of per diem interpreters in 146 languages, ranging from the most prominent languages spoken in New York courts such as Spanish, Russian, Arabic and Cantonese, to less frequently spoken languages and dialects from Amharic, to Dari, to Pampangan, to Zarma.
Serving as a fiduciary for the estate of a loved family member is an important role which is entirely controlled by the surrogate’s courts. While surrogates have an obligation to ensure that every fiduciary they appoint has the capacity to fulfill her obligations, English language competence is not, and should not be a prerequisite, any more than it is to exercising the franchise or obtaining public services. An otherwise competent non-English speaker should be denied fiduciary status only in those *1029 rare situations where no accommodations are available, or can reasonably be provided, to address any deficiency caused by lack of English language competence.
Applying this rule of presumptive competence to the instant case, there is clearly no basis upon which to deny letters of administration de bonis non to decedent’s father, Domingo Toribio. The limited letters originally granted to decedent Jannin’s sister Jennifer authorized her to bring a wrongful death action. According to the attorneys retained to prosecute the claim, Jennifer has become increasingly difficult to contact, and has agreed to resign and have her father, Domingo, appointed in her stead. Also, according to the attorneys, Domingo’s brother, Ernest, acts as an interpreter for him; in addition, they are prepared to engage a Spanish interpreter if and when one is necessary.
Most fiduciaries, native born and fully literate in English, rely on counsel to navigate the court system, particularly where the potential asset of a decedent’s estate is a personal injury or wrongful death action. The proposed administrator here is no less likely — or entitled — to rely on counsel. He and his counsel have established satisfactory means of communication such that he can exercise his fiduciary responsibilities, and secure for the estate whatever assets may be available as a result of Jannin’s tragic death. There is no reason to believe that decedent’s estate will not be properly administered if her father is appointed, notwithstanding his inability to read, write, or understand spoken English.
To serve as a fiduciary is one of the last services a family member can perform for a loved one who has passed away. It is a court sanctioned, and often, as here, court appointed position (SCPA 103 [21]). The SCPA specifically provides a preference that family members serve as administrators of the estates of persons, including children like Jannin, who die without a will (SCPA 1001). Given the commitment of our national, state, and city governments to provide access to our democratic institutions to non-English speakers, and the special responsibility and commitment of our court system to provide access to and participation in the institutions of justice, lack of English language proficiency should not, by itself, prevent appointment as a fiduciary.
Accordingly, petitioner’s application to resign is granted, upon the qualification of Domingo Toribio as her successor.

. For a thoughtful discussion of the importance of government action to ensure accessibility in a multilingual society, see Cristina M. Rodriguez, Language and Participation (94 Calif L Rev 687 [2006]).

. SCPA 707 (2) reads: “Persons ineligible in court’s discretion. The court may declare ineligible to act as fiduciary a person unable to read and write the English language.”

. Numerous other federal orders and regulations commit government to providing language assistance to ensure full participation. (See e.g. Improving Access to Services for Persons with Limited English Proficiency, Exec Order No. 13166, 65 Fed Reg 50121 [Aug. 11, 2000] [“The Federal Government is committed to improving the accessibility of (government services) to eligible LEP (limited English proficient) persons ... To this end, each Federal agency shall examine the services it provides and develop and implement a system by which LEP persons can meaningfully access those services”]; Dept of Justice Regs [28 CFR] § 42.104 [b] [2] [prohibition on discrimination based on race, color or national origin in federally financed programs which has a disparate impact; federal financial assistance recipients must provide meaningful access to LEP persons]; Dept of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed Reg 41455 [June 18, 2002] [recipients of federal financial assistance must ensure meaningful access to programs and activities for LEP individuals].)

. (See e.g. Election Law § 3-412 [1-a] [providing that New York State election workers have an obligation to assist voters with limited or no English proficiency]; § 5-216 [providing that a non-English-speaking individual may be assisted by a relative to interpret when registering to vote].)

. (See Campaign for Fiscal Equity v State of New York, 100 NY2d 893 [2003] [holding that New York State law requires the opportunity for a sound *1027 basic education for all students to meet the goal of meaningful civic participation in contemporary society].)

. (See 10 NYCRR 405.7 [requiring all New York State public hospitals to develop a language assistance program to ensure meaningful access and understanding of patients’ rights].)

. These statistics, based on the 2000 census, are taken from the New York City Department of City Planning Web site, in an executive summary of the series of reports entitled The Newest New Yorkers (available at http:// www.nyc.gov/html/dcp/html/census/nny_exec_sum.shtml [accessed Apr. 12, 2009]).

. The Dominican Republic was the largest source of foreign born, followed by China, Jamaica, Guyana, Mexico, Ecuador, Haiti, Trinidad and Tobago, Colombia and Russia. (New York City Department of City Planning Web site, supra n 7.)

. (New York State Comptroller, Office of Deputy State Comptroller for City of New York, Report 11-2000, Queens: An Economic Review, available at http://www.osc.state.ny.us/osdc/rptll00/rptll00.htm [accessed May 3, 2009].)

. (Leanna Stiefel, Amy Ellen Schwartz and Dylan Conger, Language Proficiency and Home Languages of Students in New York City Elementary and Middle Schools [Taub Urban Research Center, NY University 2003], available at http://www.eric.ed.gov/ERICDocs/data/ericdocs2sql/ content_storage_01/0000019b/80/la/d8/5c.pdf [accessed May 3, 2009].)

. (See The Newest New Yorkers, available at http://www.nyc.gov/html/ dcp/html/census/nny_overview.shtml.)

. (See e.g. Philip Kasinitz, John H. Mollenkopf, Mary C. Waters and Jennifer Holdaway, Inheriting the City: The Children of Immigrants Come of Age [Harvard University Press & Russell Sage Foundation 2008].)

. (See http://www.nyc.gov/html/dcp/html/census/nny_exec_sum.shtml, supra.)

. (See http://www.vote.nyc.ny.us/register.html [accessed Apr. 13, 2009].)

. (Available at http://www.nycourts.gov/courtinterpreter/pdfs/ action_plan_040506.pdf [accessed May 3, 2009].)