**Tallulah MORGAN et al., Plaintiffs,**

v.

**John A. NUCCI et al., Defendants.**

**Civ. A. No. 72–911–G.**

United States District Court, D. Massachusetts.

July 5, 1985.

Larry Johnson, Robert Pressman, Cambridge, Mass., Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Caroline Playter, Kehoe, Doyle, Playter, Novick & Strimaitis, Boston, Mass., Kenneth Kimerling, Puerto Rican Legal Defense & Education Fund, Inc., New York City, for El Comite.

Robert Blumenthal, State Bd. of Educ., Quincy, Mass., Robert H. Bohn, Jr., Sp. Asst. Atty. Gen., Gitlin, Emmer, Kaplan & Bohn, Boston, Mass., for State Bd. of Educ.

Steven P. Perlmutter, Asst. Corp. Counsel, Boston, Mass., for Mayor, City of Boston.

James T. Grady, Grady, Dumont and Dwyer, Boston, Mass., for BTU–Boston Teachers Union.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for BASAS-Boston Ass'n of School Administrators and Supervisors.

Robert Pressman, Martin A. Walsh, Boston, Mass., for Community Relations Service.

Lucille Koch, Evalena Higginbottom, Acting co-Executive Directors, Citywide Parents Council, Boston, Mass., for Transition Counsel.

Marshall Simonds, Henry C. Dinger, Goodwin, Procter & Hoar, Michael Betcher, Maura McGroarty, Boston School Committee, Dept. of Implementation, Boston, Mass., for Sp. Counsel Boston School Committee and Boston School Dept.

Nancy Gertner, Silvergate, Gertner, Baker & Fine, Boston, Mass., Herbert Henderson, N.A.A.C.P. Sp. Contribution Fund, Brooklyn, N.Y., for Concerned Black Educators of Boston.

Thomas I. Atkins, Brooklyn, N.Y., Henry Dinger, Goodwin, Procter & Hoar, Boston, Mass., for school defendants.

## MEMORANDUM AND ORDER ADOPTING SCHOOL DEFENDANTS' PROPOSAL REGARDING OTHER MINORITY ADMINISTRATORS

GARRITY, District Judge.

On October 11, 1984 the school defendants filed a motion to modify the administrator rating and screening procedures first established by the court in orders issued February 24, 1976. One aspect of the proposed modifications concerned affirmative action in the hiring of other minority administrators and set a goal of attaining an administrative staff of ten percent other minority by January 1986, and provided that, in order to achieve the ten percent goal, at least one out of three administrative appointments would be other minorities. These modifications and several others not relevant here, were adopted by the court without objection.

However, the Boston Teachers Union ("BTU") and the Boston Association of School Administrators and Supervisors ("BASAS") objected to a further provision which stated that "[i]f there is a reduction in force or layoffs, the percentage [of other minority administrators] attained will be maintained." The parties agreed that the provision was not urgent since there were no layoffs of administrator imminent or contemplated, and the court therefore withheld decision on the matter until the BTU and BASAS could present an offer of proof and arguments supporting their objection. After considering the filings of the BTU and BASAS and the responses from plaintiff-intervenors El Comite and the school defendants, the court approves and adopts the disputed provision as an order of the court.

The sole issue in this matter is whether the court has the authority to order remedies on behalf of other minority students and their parents.[1] In this instance the

---

**1.** The unions no longer strongly argue that *Firefighters Local #1784 v. Stotts,* 1984, —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483, is relevant to this matter. That case involved the balancing affirmative action in layoffs with seniority where no judicial determination of liability had been made and no proof of discrimination against those individuals who would benefit from the affirmative action had been found. Here a finding of constitutional violations has

court's authority derives from its original findings on liability and previous orders regarding layoff procedures which constitute the law of this case, and the continuing underrepresentation of other minorities in administrative positions.[2]

At the time the liability findings were entered in 1974 black parents and their children were the only plaintiffs in this case. The court therefore emphasized and made explicit its findings regarding their treatment by the school defendants. However, the findings are also replete with references to the discriminatory treatment of "non-white" children in general and "other minority" children in particular. *Morgan v. Hennigan*, D.Mass.1974, 379 F.Supp. 410, aff'd 1 Cir.1974, 509 F.2d 580, cert. denied 1975, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449. The court set forth evidence showing that school defendant actions designed to produce and maintain segregation affected other minority children in a manner which paralleled that experience by black students in such areas as the maintenance of overcrowded and underutilized schools, *id.* at 426; the construction and acquisition of new facilities, *id.* at 428–9; districting and redistricting of schools, *id.* at 443–5; and the enrollment at the exam schools, *id.* at 467. The court summarized its findings by noting the ratio of white, black and other minority students in the public schools and stating that "[t]his overall ratio ... is far out of line with the ratios in most of the system's schools." *Id.* at 424.

The court granted the motion of El Comite de Padres Pro Defensa de la Educacion Bilingue ("El Comite") to intervene on January 23, 1975. El Comite was charged with representing the interests of non-English speaking students, or as they have become known in the parlance of this case, "other minorities". Other-minority students were immediately incorporated into

every aspect of the remedial process of this case. Most importantly, the court's remedial orders of June 1975 established student assignment procedures which required the desegregation of other minority students as well as black and white students, stating, "[t]he plan's assignment guidelines aim, first, to make sure that schools are not identifiably one-race, and secondly, to assure that no racial or ethnic group—black, white or other minority is disproportionately isolated in any school...." *Morgan v. Kerrigan*, D.Mass.1975, 401 F.Supp. 216, 240, aff'd 1 Cir.1976, 530 F.2d 401, cert. denied 1976, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386.

Remedial orders concerning faculty and administrative staff desegregation have been issued on several occasions. The orders of February 24, 1976 required the school defendants to proceed with the appointment of other minority administrators "on an accelerated basis." The court noted that "[t]he record does not support the establishment of a specific goal for the appointment of other minority administrators. However, this finding is without prejudice to the submission of further evidence by El Comite on behalf of other minority students, who are a growing component of the student body."

After a series of hearings on the issue of faculty recruiting and hiring the court explicitly found, during a hearing on June 16, 1978, that it had the "jurisdiction to enter orders with respect to the employment of Hispanic and other minority faculty no less than its jurisdiction to enter orders regarding employment of black faculty." The court's decision at that time was based on "the separate treatment of the other minority students in the school system ... and the subsequent affirmances on appeal ... of the [student assignment] plan [which] gave the other minority group no less in

been made. The Supreme Court's analysis of individual proof of discrimination is inapplicable in the present situation, where the remedy is sought on behalf of third parties: the public schoolchildren of Boston.

2. The court's remedial orders concerning faculty and staff desegregation are based on the remedial requirements of the plaintiffs and plaintiff-intervenors, not on any independent rights of black and other minority educators themselves.

the way of rights to remedy than the black or white groups." The order of July 5, 1978 which required the school defendants to "use their best efforts to continue to increase the percentage of other minority administrators ..." was later withdrawn pursuant to a comprehensive remedial agreement, based upon *Lau v. Nichols,* 1974, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1, between El Comite and the school defendants reached during the pendency of an appeal of the July 5 order. However the basis of the court's finding regarding the extent of its authority remains valid and it is now reaffirmed.

The court made use of this authority in 1981 when the school defendants sought to lay off teachers. After another extensive investigation into the extent of faculty desegregation, it ordered on June 2, 1981 that "the systemwide percentage of other minority teachers will remain at its current level." [3] The June 2, 1981 order was appealed and affirmed. *Morgan v. O'Bryant,* 1 Cir.1982, 671 F.2d 23, *cert. denied,* 1982, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64.

The current status of other minority administrator hiring justifies the extension of this remedial protection as agreed upon by the school defendants and El Comite. Other minorities constitute approximately ten percent of the population of Boston and 24 percent of the public school student population, yet the school system's administrative staff has never been more than six percent other minority. As of August, 1984, other minorities constituted 5.56 percent of the total number of administrators. Most of these other minority administrators have been hired only recently and have relatively little seniority. They would therefore be disproportionately affected by layoffs if not granted protection. The protection afforded other minority administrators by the school committee's proposal is not absolute, but merely guarantees that the slow and fitful progress in other minority hiring

made thus far be preserved. Thus other minority administrators could be laid off, but only in proportion to their numbers.

Accordingly, the objections of BRU and BASAS are overruled and the provision of the school defendants' proposed modification of the administrator screening and rating process which states that "[i]f there is a reduction in force or layoffs, the percentage [of other minority administrators] attained will be maintained," is adopted as an order of the court.

## MEMORANDUM, DRAFT FINAL JUDGMENT AND NOTICE OF HEARING

In its Memorandum and Orders of Disengagement issued December 23, 1982 the court provided the parties with a transitional mechanism for bringing the court's involvement in the remedial process of this case to an end. Those orders were the first step, after the court's efforts to promote a consent decree had failed, toward closing the case and returning to the community in general and to the school committee and department in particular the responsibility for protecting the rights of black and other minority parents and schoolchildren within the Boston public school system. Since then the court has terminated its jurisdiction in several areas in which remedial orders were entered and has approved many modifications of the student desegregation plan advanced by the defendants. It is now time to take the final steps to close this case. Seeking as broad an agreement as possible regarding the terms of the court's withdrawal, the court herewith issues a draft form of its final judgment, for comment and discussion by the parties.

The fact that the procedural mechanism created by the December 1982 Orders for the resolution of disputes between the parties was so little used is evidence that the parties have developed a common under-

---

**3.** When a similar order regarding black administrators was issued at the hearing of July 9, 1981, an order regarding other minority administrators was deemed unnecessary because of · the school defendants' plans to retain the only two other minority principals employed at that time.

standing of their respective rights and responsibilities under the remedial plan and have become familiar with its operation. The new thirteen-member school committee has gained important experience in overseeing the remedial phase of this case and it has demonstrated its willingness and ability to implement it. Mayor Raymond L. Flynn has made a strong public commitment to the continuing vitality of the Boston public school system and to desegregation. Joseph M. McDonough, who demonstrated his fidelity to the principles of desegregation in serving as the first temporary receiver of South Boston High School and in several other administrative positions within the school department, has been named acting superintendent. Pupil attendance percentage during the 1984–85 school year was 88.5 percent, the highest since the 1970–71 school year. The five reports published by the State Board of Education pursuant to the December 1982 orders provide a clear assessment of what has been and what remains to be accomplished.

On December 20, 1984, the deadline set by the court for proposing modifications for the 1985–86 school year, the school defendants presented to the court eleven proposed modifications, such as: a new assignment procedure in districts 3 and 4; consolidating the community school districts for administrative efficiency; allowing kindergartners to attend their geocoded elementary school; consolidating Madison Park and the Occupational Resource Center; transforming the Umana School into a district 8 middle school; adding grade six to the exam schools; permitting some schools to compete for a certain number of students without regard to geocode; and allowing schools in integrated neighborhoods to compete for the neighborhood students without regard to geocode. Amplification of the proposals in open court and negotiations among the parties resulted in eight of the eleven proposed modifications

being adopted by the court with the full concurrence of the parties. This experience demonstrated the potential for continuing progress through future negotiations within a frame of reference fashioned by decisions of the Supreme Court of the United States.

The draft final judgment attached hereto is designed to establish basic principles which must survive the court's departure and to transfer to the school defendants, without judicial oversight, the responsibility for changes that do not conflict with these basic principles. Toward this end the draft establishes two categories of orders. First are permanent orders on six essential aspects of the desegregation remedy. Next is a permanent order requiring the school defendants to carry out the specific orders constituting the present amended remedial plan, unless modified by the school defendants after structured negotiations. These permanent orders would be enforceable by any party to this case through a petition to the court alleging that the defendants were violating the final judgment.[1] An explanation of each order follows.

**(1) Unified Facilities Plan**—This permanent order requires that the school, city and state defendants, the so-called joint planners, carry out the Unified Facilities Plan pursuant to an order to be issued in the near future. The court already, on May 9, 1985, adopted and ordered into effect facilities improvements as submitted by the joint planners for 1985–86, the first year covered by the '85 UFP. The UFP order will for the most part adopt the '85 UFP filed by the parties, but will for purposes of desegregation rearrange the priorities accorded to renovations during the 1986–87 school year and thereafter at particular schools. The UFP will not be as comprehensive or refined as it might be, but will call for as much as can be achieved consistently with the financial condition of

---

1. The court does not anticipate that such petitions will be necessary for the same reasons that it finds that the time is ripe for ending its involvement in the case. However, the plaintiffs are entitled to court enforcement in the event that the school defendants violate permanent orders.

the city. A decade of procrastination by the joint planners must end.

**(2) Permanent Injunction**—This order repeats the injunction prohibiting discrimination and segregation on the basis of race which was initially issued in 1974 as a partial judgment following the court's finding of liability. *Morgan v. Hennigan,* D.Mass.1974, 379 F.Supp. 410, 484. It is a broad, partial statement of the plaintiffs' rights in the remedial stage of a desegregation case; partial because plaintiffs are also entitled to specific affirmative relief from the continuing effects of past discrimination. *Green v. County School Board of New Kent County,* 1968, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716.

**(3) Student Assignments**—The preservation of desegregation in student assignments is required by this order. "The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation." *Swann v. Charlotte-Mecklenberg Board of Education,* 1971, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554. Changing circumstances such as the racial/ethnic distribution of the population, construction or closing of facilities or new programs may require changes in assignment methods or guidelines. However, the acceptable levels of desegregation under the current circumstances, including the new assignment process in districts 3 and 4, have been clearly developed in the form of flexible self-adjusting ranges which may be applied to many situations without the need for modifications.

Under this paragraph the method of assigning students or the racial ethnic guidelines may be changed by the school defendants after public notice and negotiations, provided that they make every effort to assure that the resulting enrollments reflect the public school population of the district to the greatest degree practicable. A point made by the State Board in its annual report on desegregation in Massachusetts dated February, 1984, bears repeating:

Monitoring of the [court-ordered] assignment system over the past year confirms its complexity and impartiality, and suggests that changes should be made only with great care and a good understanding of their possible unanticipated consequences.... A system which has achieved extensive desegregation with a high proportion of students receiving their schools of choice should not be abandoned lightly.

The term "assignment district" is used in the order to distinguish the districts as recently consolidated for administrative purposes and the eight community districts which serve as the assignment areas and have not been consolidated. The vote of the school committee on June 25, 1985 appointing five acting district superintendents did not make the distinction between assignment districts and administrative districts which was clearly stated by their attorney in the motion presented to and approved by the court. The distinction is important because desegregation within each school is premised on racially and ethnically representative assignment districts. District lines were drawn with great care and after much consultation by the four masters in 1975 and, although demographic changes have occurred, they remain a workable foundation for desegregation and should not be changed except with equal care.

**(4) Parent Councils**—As stated in the court's order of October 4, 1974, the purposes of these councils were and remain "to insure adequate and impartial investigation and responsible recommendations on racially and ethnically oriented problems arising at the school; to create a means of communication between parents, students, teachers and administrators regarding the solution of such problems; and to promote an environment of understanding and common purpose among the various elements of the community so that the best available education may be offered to all children."

In the course of restructuring the City-wide Parents Council ("CPC") and the School Parent Councils ("SPCs") in 1982,

the parents and the Boston School Committee negotiated and signed an agreement dated November 8, 1982, and filed with the court on November 17, 1982. This agreement was called "an historic step forward for the Boston Public Schools" and was "intended to strengthen the parent role in facilitating the desegregation of the Boston Public Schools and improving the quality of education provided to all children in the Boston Public Schools."

However, the court-ordered parent organizations have never been completely accepted by the school defendants and the full promise of their participation in the public school community has yet to be realized. For example, the first section of the 1982 agreement provided that the school defendants' central administration would disseminate to each principal and SPC monthly data reports which would serve as an agenda item for meetings between them. The third section provided that, "[w]here new planning or program initiatives are proposed on the district or school level, the appropriate School Parent Council or District Parent Council shall appoint parent members to these task forces/committees. Parent members of these task forces/committees should regularly report on committee activities to the School Parent Council or the District Parent Council." Nevertheless, despite exemplary service by CPC members on staff screening committees, the court-ordered councils are excluded from the process whereby parents are selected for membership in School Based Management and School Improvement Programs. Are parents who have been duly elected to SPCs being reorganized out of their agreed roles?

The CPC and SPCs were not established to be simply school booster organizations or symbolic representatives. The school defendants must live up to their agreement and do everything they reasonably can to help the duly elected parent councils deliver the unique assistance for which they were created. Accordingly the draft order provides that the CPC and SPCs would become self-governing bodies and be adequately funded, thereby securing a stable future in which they may for the first time have a real opportunity to establish their effectiveness.

(5) **Faculty and Staff**—The January 28, 1975 and February 24, 1976 orders concerning faculty and staff desegregation respectively, required that the school defendants maintain black faculty and both central and school-based administrators at no less than 20% of the total of each group, and set an affirmative action goal of 25%[2] later adopted and reaffirmed by the school committee. The 20% figure was chosen because it represented the approximate percentage of black residents in Boston at that time. Since that time the percentage of residents of Boston who are black has risen to approximately 23% and can be expected to continue to change in the future. Currently, the number of black administrators is 24% of the total in both category I (school-based), and category II (central and district), but black faculty are still below 21% of the total. Paragraph 5 of the permanent orders preserves the workability of these orders by providing a self-adjusting minimum of faculty and staff desegregation tied to the percentage of black residents in the City of Boston.[3]

(6) **Department of Implementation**—Paragraph 6 of the permanent orders preserves an organization whose continuing presence will be essential to the future progress of the remedial process. The Department of Implementation ("DI") has provided a centralized unit within the School Department with a staff of approxi-

---

**2.** The January 28, 1975 order is published at *Morgan v. Kerrigan,* 388 F.Supp. 581, and affirmed by the First Circuit, 1 Cir.1976, 530 F.2d 431, cert. denied, *Doherty v. Morgan,* 1976, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386. The February 24, 1976 order was never published, nor appealed.

**3.** The recruitment and hiring of other minority faculty and staff is governed by a so-called Lau Agreement (after *Lau v. Nichols,* 1974, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1) between the school defendants and El Comite approved by the court on November 26, 1984.

mately 44 professionals which is experienced in the implementation of the remedial plan and can be held accountable. As described in the court's memorandum and orders of May 6, 1977, which established the DI in its current form, the DI staff's responsibilities include:

supervising student assignments, transfers, data processing, and programmatic concerns ... assur[ing that] students are assigned to schools in accordance with court-ordered procedures ... initiat[ing] investigations and corrective actions ... investigating problems related to the availability of appropriate facilities, equipment and materials, and recommending corrective actions ... initiating and carrying out curriculum and staff development activities to assure that individual schools have suitable programs to meet the complete range of student needs resulting from the implementation of court-ordered desegregation ... assign[ing] new students in the system in accordance with court-ordered guidelines ... receiv[ing] and check[ing] applications for student assignments ... the collation and categorizing of Applications for Assignment ... the reassigning of students who have moved to new geocodes and assignments to the Examination Schools, the Magnet Schools, to Vocational Programs and to Bilingual and Special Education programs.

The December 1982 Orders charged the DI with acting as the internal monitor of the school defendants' compliance with court orders and as a source of information to the parties and the CPC and the State Board.

Diffusing these extensive and complex responsibilities would impair the school department's ability to administer the plan in a stable and predictable manner and to develop and coordinate appropriate modifications of the existing plan when needed. Moreover, any dismantling or significant reduction in the size of the DI would diminish the effectiveness of the State Board, parents and others who must rely on information provided by the DI in evaluating the performance of the school defendants.

(7) **Previous Orders**—Paragraph 7 applies to orders apart from the basic principles embodied in the preceding paragraphs. Specific court orders previously issued in areas in which the court has not terminated its jurisdiction shall continue to govern the remedial process in this case, but may be modified without, however, lessening the school defendants' obligation to carry them out as modified. After years of experience and adjustment, the current remedial plan has proven to be workable and equitable.

(8) **Modification Procedure**—The role of the court in suggesting and approving modifications is eliminated. The State Board's detailed monitoring of the desegregation process, ordered by the court in December 1982, shall cease. Responsibility for proposing necessary modifications and ultimately deciding upon them will be lodged exclusively with the School Committee; but the procedural mechanisms provided will require that proposed modifications be subjected to the scrutiny and appraisals of responsible state and city officials and parent groups.

The procedural mechanism for modifying previous court orders requires the participation of an organization such as the Boston Chapter of the NAACP, which has long-standing and stable ties to the plaintiff class of black parents. The various entities which provided legal representation for the plaintiffs during these proceedings seem not as well suited to representing the black community in long-term negotiations as a permanent, local organization.

### Notice of Hearing

Comments and legal memoranda regarding the draft final judgment may be filed on or before July 26, 1985 and replies by August 5, 1985. A hearing as to the entry of final judgment in the form of the attached draft or in another form is hereby scheduled for August 7, 1985 at 2:00 p.m.

### [DRAFT] FINAL JUDGMENT

After hearing and consideration of the parties' comments and positions on the

draft final judgment issued on July 5, 1985, and on the basis of all orders and memoranda of decisions previously entered in these proceedings, it is ORDERED and ADJUDGED that the school defendants, viz., members of the Boston school committee, Superintendent of Schools, their officers, agents, servants employees, attorneys, and all other persons in active concert or participation with them who have actual notice of this judgment:

### Unified Facilities Plan

(1) shall take all steps reasonably necessary, jointly with the city and state defendants, to whom this paragraph also applies, to implement the Unified Facilities Plan as approved and modified by orders entered last month;

### Permanent Injunction

(2) be permanently enjoined from discriminating on the basis of race in the operation of the public schools of the City of Boston and from creating, promoting or maintaining racial segregation in any school or other facility in the Boston public school system;

### Student Assignments

(3) shall assign students so that to the greatest degree practicable the racial/ethnic composition of each community district school reflects the public school student population residing in the assignment district in which the school is located, and of each citywide magnet school, the citywide public school population exclusive of district 8;

### Parent Councils

(4) shall maintain the Citywide Parents Council and School Parent Councils as adequately funded, self-governing organizations capable of meeting their court-ordered responsibilities;

### Faculty and Staff

(5) shall maintain a proportion of black faculty and administrative staff at least commensurate with the proportion of black residents in the City of Boston as measured in each quintennial federal census;

### Department of Implementation

(6) shall maintain the Department of Implementation as a distinct unit, adequately staffed and with full access to computer facilities, capable of meeting its court-ordered responsibilities;

### Previous Orders

(7) shall carry out all existing orders previously entered in areas in which the court has not terminated its jurisdiction and, if modified as hereinafter provided, such modified orders;

### Modification Procedure

(8) The school defendants may modify any order previously entered in these proceedings provided (a) that such modification is specific and does not violate the permanent orders stated in the seven preceding paragraphs and (b) that notice and opportunity to be heard is given, as follows: they shall issue a public notice identifying the order to be modified and the proposed modification; and shall mail copies to (a) the State Board of Education, (b) the Attorney General for the Commonwealth, (c) the Mayor, (d) the Citywide Parent Council and (e) the Boston chapter of the NAACP, to all of whom the Department of Implementation shall promptly make available all relevant data reasonably requested. The Board of Education shall within three weeks initiate and moderate negotiations concerning the proposed modification. After agreement has been reached or the Board has determined that further negotiations would not result in agreement, or more than three months have passed since the public notice was given, whichever is earliest, the School Committee may adopt or reject the proposed modification either as initially proposed or amended during negotiations, provided that it is specific and does not violate the permanent orders.