Gants, J.
The plaintiffs, the Bilingual Master Parents Advisory Council (“Master PAC”) and representative members of Master PAC, all of whom are both members of Master PAC and parents of children enrolled in bilingual programs in the Boston Public Schools,[1] have brought this action against the defendant Boston School Committee, the members of the School Committee (in their official capacity), and Thomas Payzant, the Superintendent of the Boston Public Schools.[2] Master PAC seeks through this action *613 to obtain a court order directing the School Committee to comply with four provisions of a broader agreement regarding bilingual education known as the Voluntary Lau Compliance Plan ("Lau Plan” or “the Plan”) that was first approved by the School Committee on November 30, 1979 and last revised on November 4, 1992.[3] More precisely, Master PAC asks this Court (1) to enter a declaratory judgment declaring that the Lau Plan constitutes a binding and enforceable agreement between Master PAC and the School Committee, (2) to find that the School Committee has materially breached four provisions of that binding and enforceable agreement, and (3) to issue an injunction ordering the School Committee to comply with those four provisions. The defendants argue that the Lau Plan is not a binding and enforceable agreement but simply a statement of policy that can be revised or even ignored by the Superintendent of Schools without legal consequence.
To resolve this important dispute well before the beginning of the 2002-2003 school year, this Court established an expedited discovery schedule and directed the trial to commence on April 29, 2002, which it did. All parties waived any rights they may have had to a jury trial, and agreed to have all issues decided through a bench trial. This Court heard testimony at trial for four days. Based on the testimony at the trial, the exhibits admitted into evidence at trial, and the stipulations of the parties, viewed in light of the governing law, this Court makes the following findings of fact and conclusions of law.
BACKGROUND
The Boston Public Schools, like all other public schools in the Commonwealth, have been required since 1971 to provide “children of limited English-speaking ability” with a “program in transitional bilingual education”a full-time program of instruction that includes courses in required subjects in both the native language of the child and in English, bilingual reading and writing instruction, and bilingual instruction in the history and culture of the student’s native country and the United States. G.L.c. 71A, §§1 etseq.[4]
In 1978, the Boston Public Schools’ bilingual program was, at best, seriously flawed. On January 16, 1979, a Bilingual Implementation Team (“Implementation Team” or “Team”), comprised of a broad cross-section of parents of bilingual children and bilingual educators in the Boston Public Schools, submitted to then-Boston School Superintendent Robert Wood a report for the reorganization of the Bilingual Department in the Boston Public Schools. This Implementation Team Report (“Report”) described the history of bilingual education in the City of Boston “as one of benign neglect.” Exhibit 7, Report, Introductory Narrative, p. 1. The Report observed that United States District Court Judge W. Arthur Garrity had described the bilingual department in the summer of 1977 as the worst department in the entire school system, and
the Implementation Team contended that Judge Garrity had good reason to make that assessment. Id. The Report declared that the Bilingual Department was then trying to serve more than 5,000 bilingual students with only one permanent director and eight “consulting teachers.” Id. The Report set forth detailed recommendations regarding reorganization, personnel, bilingual curriculum, and special services.
On February 16, 1979, Superintendent Wood thanked the Implementation Team for their efforts and provided the Team with the Boston Public Schools’ response to the Report, which proposed changes that fell far short both in detail and scope of what the Report had recommended. Exhibit 8. On February 28, 1979, the Implementation Team responded in writing to Superintendent Wood’s letter, telling him that the Boston Public Schools’ response “is not acceptable to us, because it continues to ignore the need for the provision of full educational services to linguistic minorities, thus violating their right to an equal educational opportunity.” Exhibit 9 at p. 1. The Implementation Team accused Superintendent Wood and his staff of failing “to give sufficient and serious consideration to the issues brought forth in our report,” and summarized the major points of his response which the Team had rejected. Id.
Faced with what it considered a wholly unacceptable response to the Implementation Team’s proposal, the Master PAC, an umbrella parent advisory organization comprised of parents of bilingual children enrolled in the Boston Public Schools, decided to pursue simultaneously a two-pronged strategy.[5] The first prong was to attempt to persuade the School Committee and the Superintendent to improve the quality of bilingual education, and to work with them towards that goal. The second prong was to request Master PAC’s attorney, Alan Rom, to draft a complaint and prepare to file suit against the School Committee for its alleged failure to comply with constitutional and statutory obligations regarding the provision of bilingual education.
Under the first prong of its strategy, Master PAC intensively lobbied School Committee members and School Department staff about the need for major improvements in bilingual education. It also organized a rally of bilingual parents before the School Committee in March or early April 1979, which between 300 and 400 parents attended. It also made it plain to the School Committee, the Superintendent, and his staff that, while it intended to work cooperatively with them to achieve the necessary changes in bilingual education, it would file suit before Judge Garrily in United States District Court if its efforts to achieve these changes through cooperation proved fruitless.
Indeed, during this same time period, Rom began drafting a federal court class action complaint that, if filed, would have sought declaratory and injunctive relief for what the complaint alleged were violations of *614 the United States Department of Health, Education and Welfare (“HEW") guidelines.[6] These guidelines required school districts to “take affirmative steps to rectify the language deficiency” where the “inability to speak and understand the English language excludes national origin-minority group children from effective participation in'the educational program offered by a school district.” Exhibit 19, Draft Complaint at p. 13, quoting 35 Fed. Reg. 11595. The draft complaint alleged that the School Committee had violated the HEW guidelines, the minimum standards that HEW had established to determine compliance with these guidelines, Title VI of the Civil Rights Act of 1964, the Equal Education Opportunities Act of 1974, and the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution. Exhibit 19, Draft Complaint at pp. 13-14, 18-22. While neither Master PAC nor Rom ever provided a copy of this draft complaint to the School Committee or its representatives, they were not shy about discussing with them the existence of such a complaint, the nature of its allegations, and their readiness to file the complaint if they were not able to reach an agreement regarding the future of bilingual education in the Boston Public Schools with the School Committee.
The Master PAC’s two-pronged strategy had its desired effect. On March 28, 1979, the School Department, and the Implementation Team agreed to meet over the next two weeks in an attempt to resolve their differences. During three meetings on April 3,6, and 10, 1979, those differences were essentially resolved and a course of action agreed upon. OnApril 11, 1979, the Boston School Committee passed a Resolution approving the agreements that emerged from those meetings, and ordered the agreements to be incorporated in a revised plan for the reorganization of the Bilingual Department, which the Superintendent was directed to carry out forthwith. The Resolution also provided that:
3. The School Administration continue to work with the Bilingual Implementation Team and Master Parents Advisory Council to 1) resolve any remaining differences; 2) revise the voluntary Lau compliance plan, 3) draft a philosophy and policies of bilingual/bicultural education to be presented to us for approval by the end of the school year, and 4) monitor and evaluate the implementation of the above-stated agreements.
4. The School Committee forward all relevant documents already approved, or to be approved in the future, concerning these agreements to the federal court to be incorporated in the official court records of Morgan v. Finnegan[7] and to the Bilingual Implementation Team and Master Parents Advisory Council.
April 11, 1979 Resolution, Exhibit 10.
As a result of this April 11,1979 School Committee Resolution, Master PAC and the Implementation Team entered into intensive negotiations with the School Department to prepare a voluntary Lau compliance plan and “draft a philosophy and policies of bilingual/bicultural education.” Rom served as Master PAC’s primary negotiator. The School Department was represented primarily by Michael Betcher, general counsel to the Boston School Department, and Marya Levenson, Superintendent Wood’s primary assistant. Between April 1979 and the final approval of the Voluntary Lau Compliance Plan by the School Committee on November 30, 1979, there were more than fifty negotiation sessions to resolve differences regarding the content and scope of the Plan and related issues.
These negotiations occurred in the context of the continuing Boston Public School desegregation litigation before Judge Garrity. On July 5, 1978, in response to a motion brought by the plaintiff El Comite de Padres, Judge Garrity issued a Memorandum and Further Orders on Faculty Recruiting and Hiring that, for the first time, imposed an obligation upon the School Committee to use best efforts to hire non-black minority teachers.[8] Judge Garrity declared:
Although no specific goals are set regarding the rehiring and hiring of other minority teachers, the city defendants shall use their best efforts to continue to increase the percentage of other minority teachers in the school system overall and in the area of regular education.
Morgan v. McDonough, Civ. No. 72-911-G, Memorandum and Further Orders on Faculty Recruiting and Hiring, July 5, 1978 at p. 4. Judge Garrity added in a footnote:
The record does not support the establishment of a specific goal for the hiring of other minority teachers. However, future developments may require the court to re-examine this ruling.
Id. The School Committee had appealed this Order regarding non-black minority teacher hiring to the United States Court of Appeals for the First Circuit, and that appeal was pending during the Lau Plan negotiations.
During the course of the negotiations between the School Department and Master PAC regarding the Lau Plan, it emerged that the School Department was prepared to make significant concessions regarding bilingual education, including doing more than was required by law, in return for avoiding the intervention of the federal court. Stated succinctly, it was of critical importance to the School Department and the School Committee that they, not Judge Garrity, determine the future of bilingual education in the Boston Public Schools.
In order to keep the federal court out of bilingual education, the School Committee insisted upon and Master PAC ultimately agreed that, in return for the Lau Plan and a related agreement regarding the hiring *615 of non-black minority teachers, El Comité de Padres would move to vacate Judge Garrity’s Order regarding non-black minority hiring. As a result, in September 1979, El Comité de Padres filed a motion before Judge Garrity asking him to declare his inclination to vacate this order, noting that the School Committee was prepared to agree, as part of the Lau Plan, to enhance faculty employment opportunities for non-black minorities. The plan of action set forth in this motion was that, if Judge Garrity were to declare his inclination to vacate this order, the parties would ask the First Circuit to remand its pending case to the District Court so that the order being appealed could be vacated. Prior to the School Committee’s approval of the Lau Plan on November 30, 1979, Judge Garrity did indeed declare his inclination to vacate his order regarding non-black minority hiring if the School Committee were to approve the Lau Plan. After the Plan was approved, the First Circuit remanded the case to Judge Garrity, who did vacate the order, thereby mooting the appeal.
Separate and apart from avoiding Judge Garrity’s intervention in non-black minority teaching hiring, the School Department insisted that the Lau Plan not be a consent decree. The School Department wanted it to be a private agreement, between only the School Committee and Master PAC, and not an order of the court to be enforced by the court. Similarly, the School Department did not want the HEW Office of Civil Rights to have oversight over the implementation of the Lau Plan. It insisted that the Lau Plan be provided to the Office of Civil Rights solely for informational purposes, and that the Plan expressly not be under its jurisdiction.[9] Master PAC ultimately agreed to both of these demands, and they were embodied in the School Committee Resolution of November 30, 1979 that adopted the Lau Plan.
On September 13, 1979, the negotiators had reached agreement on a proposed Lau Plan and, along with a cover letter from Rom, the Plan was transmitted to the School Committee for adoption. In his cover letter, Rom praised the cooperation among parents, teachers, and administrators that permitted the Lau Plan to reach fruition. He wrote, "I believe that it can safely be stated that a new relationship is beginning to emerge; one in which parents, teachers and administrators are discussing with each other educational solutions to the problems challenging the Boston Public Schools.” He declared, “The end product is a plan which incorporates all of our agreements concerning administrative structure, philosophy and policies and an educational plan based on sound pedagogy.” He asked the School Committee to schedule a meeting for the purpose of formally adopting the Lau Plan. Exhibit 22.
The School Committee met on November 27, 1979 to consider the proposed Plan.
Superintendent Wood introduced the Plan to the Committee. He told them:
I should say that this plan reflectsand I previously sent it to the Membersthe continued effect of cooperation between the Bilingual Team and the Advisory Council. It allows us to be in voluntary compliance. It represents, I think, in the view of all parties a substantively valid plan, and it also removes the School Department and our policies from oversight by the Federal Government, which I think in terms of how it’s used to carry out this plan is an advantage.
Therefore, as you will note, it is a private contract, an agreement between the parties involved, and on acceptance will allow us in thié area to move at our own direction and speed.
School Committee Meeting, Nov. 27, 1979, Exhibit 5 at pp. 41-42.
Both Superintendent Wood and Rom explained to the School Committee that the adoption of the resolution would result in the withdrawal of Judge Garrity’s Order regarding “other minorities” and the consequent withdrawal of the School Committee’s appeal of that Order. School Committee President David Finnegan observed:
I understand we are reaching, in effect, an agreed-stipulation on a court case that is in the Circuit Court of Appeals consistent with a document that I honestly believe calls for a far-reaching commitment of the Boston Public Schools and one which future committees are going to have to carry out.
Id at p. 56.
Two issues troubled some members of the School Committee, including President Finnegan. First, some Committee members did not believe they had enough information regarding the future cost of the Plan or enough time to consider its cost implications. Second, President Finnegan was concerned that the proposed Plan went beyond transitional bilingual educationdesigned to help those students who speak little or no English to make a gradual and successful transition into an all-English educational settingand added a commitment to language maintenancedesigned to permit those who speak a foreign language to maintain their fluency in that language even after they became fluent in English. The Committee agreed to table the Plan until its next meeting on November 30, 1979 so that these two issues could be resolved.
Prior to the November 30, 1979 meeting, the issues regarding the future cost of the Plan were resolved to the satisfaction of the School Committee members. President Finnegan, however, remained concerned at the November 30 meeting about a sentence in the Philosophy Section of the Plan that declared, “At the same time we recognize that bilingual students may want to maintain the richness of speaking two lan *616 guages, and we are enabling such students to elect courses on a space-available basis in their native language.” School Committee Meeting, Nov. 30, 1979, Exhibit 6 at p. 67. President Finnegan believed that the issue of language maintenance should be addressed through a recommendation from the Department of Curriculum and the Department of Bilingual Education, and should not be included in “a document which, after all, is a reconciliation of court cases and Constitutional challenges . . .” Id. at pp. 65-66, 71. The School Committee voted to remove that sentence from the Philosophy Section of the Lau Plan, and then voted to approve the Plan. Id. at pp. 72-73.
The School Committee then considered the language of its proposed Resolution regarding the Lau Plan. President Finnegan had concerns with the portion of the proposed Resolution that read:
Whereas, the Boston Public School’s Voluntary Lau Compliance Plan is a reflection of progressive educational policy concerning bilingual multicultural education, and not merely compliance with the minimum Lau Guidelines.
Id. at p. 74. The President thought that this language adopted a policy “to expand bilingual multicultural education throughout the public school system," without parameters. Id. at p. 77. President Finnegan feared that this language may have legal consequence in making such an expansion the policy of the School Committee and the responsibility of the School Department. Id at pp. 76-77.
President: I would, as an advocate, be able to say that the Boston Public School Committee voted to create a policy in addition to any minimum responsibilities it has under the law. Do you agree with that?
Rom: Yes, I would.
Id. at p. 76. This language was deleted from the Resolution that was passed that day by the School Committee.
In view of President Finnegan’s recognition of the potential legal significance of this Resolution, this Court will set forth the entirety of the Resolution below:
WHEREAS, pursuant to the School Committee Resolution of April 11,1979 calling for the revision of the Boston Voluntary Lau Compliance Plan through cooperative efforts between the school administration and the Bilingual Implementation Team, and
WHEREAS, since the said April 11 Resolution the School Administration, Bilingual Implementation Team and Bilingual Master Parent Advisory Council have worked cooperatively to revise the Voluntary Lau Compliance Plan, and
WHEREAS, in light of the above the Boston Public Schools and Bilingual Implementation Team and Bilingual Master Parent Advisory Council have come to certain understandings as to the scope of the Voluntary Lau Compliance Plan and its legal status and disposition:[10]
IT IS HEREBY RESOLVED this 30th day of November 1979 that:
1. The Voluntary Lau Compliance Plan, attached hereto as Appendix “A” is hereby adopted as the Boston Public Schools Philosophy and Policy concerning Bilingual/Multicultural education;
2. Said Voluntary Lau Council [sic] Plan constitutes a commitment by the Boston Public Schools to the Bilingual Implementation Team and Bilingual Master Parent Advisory Council;
3. Said Voluntary Lau Compliance Plan shall be forwarded to the Federal District Court in Morgan v. Finnegan and to the Bilingual Implementation Team and Bilingual Master Parent Advisory Council and shall be subject to all court orders in said action. The parties to this agreement shall join together in appropriate court hearings to explain or defend the contents of said plan as consistent with existing court orders or in requesting modifications of existing court orders as is appropriate.
4. Any provisions of said Voluntary Lau Compliance Plan which are found by the court to be inconsistent with the orders of the Federal District Court in Morgan v. Finnegan shall be modified by the parties to this agreement as soon thereafter as practicable.
5. Said Voluntary Lau Compliance Plan shall be forwarded to the Office of Civil Rights for informational purposes only, and the Plan shall not be under its jurisdiction, this being a commitment by and between the parties hereto.
6. Said Voluntary Lau Compliance Plan is a living document; the parties shall meet periodically, according the [sic] Voluntary Lau Compliance Plan, to propose any modifications that they believe are in the best interests in the implementation of this Voluntary Lau Compliance Plan.
School Committee Resolution, November 30, 1979, Exhibit 11. The Resolution was signed by all five members of the School Committee, as well as by Superintendent Wood and Carmen Pola, Chairperson of Master PAC.
The Purpose and Statement of Responsibility of the 1979 Lau Plan proclaimed that the Plan stood for “a comprehensive, progressive educational plan for bilingual/multicultural programs in a bilingual/multicultural international community.” 1979 Lau Plan, Exhibit 1 at p. 1. The Purpose and Statement of Responsibility described the Plan as “a working agreement between the Boston Public Schools and the Bilingual Master Parent Advisory Council and Bilingual Implementation Team.” Id. Observing that the Plan provides for more than is required under the Lau *617 Guidelines, it declares that the Plan is “a private agreement” among these parties, “subject to modification by the parties as they deem appropriate.” Id.
The Purpose and Statement of Responsibility also provides:
Throughout the Voluntary Lau Compliance Plan references are made to specific objectives being performed by specific departments, offices, and/or positions. In no way does this specifically diminish the responsibility of the Boston School Committee for providing equal educational opportunity to all children regardless of race, color, national origin or linguistic/cultural background. By providing references to specific departments, offices, and/or positions all will understand how this plan will be implemented. In no way is it intended that any specific referenced department, office, and/or position incur any legal liability for alleged failure to implement any Goal, Objective, and/or Task specified herein and any implication to the contrary is specifically disclaimed. It is again emphasized that all authority and responsibility for implementation of this plan and the provision of equal opportunity rests with the Superintendent of the Boston Public Schools and the Boston School Committee.
Id. (italics added). The School Committee contends that the italicized sentence demonstrates that the parties did not intend that the failure to implement any goal, objective, or task set forth in the Plan would result in legal liability. Reading this sentence in the context of the entire paragraph, however, it is plain that all that the parties intended by this sentence was that no such liability would be incurred by a specific department, office, or position within the School Department. Rather, any liability, whether it be for the failure to provide equal educational opportunity or for failing to implement the Plan, would remain with the Superintendent and School Committee. In short, the authors of the Plan, conscious of the desegregation litigation, chose this language to reassure those school personnel with duties under the Plan that they were identified solely to explain how the Plan will be implemented, not to “pass the buck” to them and make them, rather than the School Committee and the Superintendent, the defendants in any litigation that may arise concerning bilingual education.
In accordance with the terms of the Lau Plan and the November 30, 1979 School Committee Resolution that adopted the Plan as the philosophy and policy concerning bilingual/multicultural education for the Boston Public Schools, the Plan was truly a “living document.” As a result of formal negotiations between the School Department and Master PAC, the Plan was revised on April 6, 1981, April 30, 1985, and, most recently, on November 4, 1992.
On May 12, 1982, at a hearing before Judge Garrity in the Boston Public Schools desegregation case, then entitled Morgan v. McKeigue, Judge Garrity denied El Comité de Padres’ motion to transfer the Hispanic bilingual program from Charlestown High School. However, he conditioned his denial of the motion upon the School Department’s compliance with the provision of the Lau Plan that set a minimum cluster size of bilingual students and teachers at Charlestown High School.’ The School Defendants asked Judge Garrity to reconsider his decision, noting that he was essentially enforcing the Lau Plan by an order of the Court. Motion for Reconsideration of Charlestown High School Order, Morgan v. McKeigue, Civ. No. 72-911-G, June 17, 1982, Exhibit 20. Judge Garrity denied the motion to reconsider.
During negotiations regarding revisions to the Lau Plan that occurred in the summer of 1984, the School Department sought to change the description of the Plan in the Purpose and Statement of Responsibility section by replacing the words “private agreement” with “department policy.” Rom, on behalf of Master PAC, rejected this change in language, and it remained in both the 1985 and 1992 revised Plans.
During the negotiations that led to the 1992 revised Lau Plan, Master PAC sought changes in the Plan’s provisions regarding the maximum student-teacher ratio in bilingual classes. Prior to the 1992 Plan, the Plans simply incorporated by reference the maximum student-teacher ratio permitted by Massachusetts Regulation 25 of G.L.c. 71A. At that time, this Regulation essentially limited bilingual classes to no more than 18 students when the teacher had no teacher’s aide, and no more than 25 students when there was an aide. Master PAC feared that the Massachusetts Department of Education was going to revise its regulations to permit even larger class sizes, and requested that the Plan lock in the existing maximum student-teacher ratios rather than incorporate by reference those in the state regulation. To obtain this revision, Master PAC was willing to make concessions on other issues, such as not pressing for bilingual education to be made available in vocational education and examination schools. Through this give-and-take, the 1992 Plan provided for essentially the same maximum student-teacher ratios in bilingual classes as the 1985 Plan, but these ratios were no longer subject to changes in state regulation. As a result, the student-teacher ratios in the Plan would continue in force even if the Department of Education revised its regulation to permit larger bilingual classes, which it indeed later did. See 603 C.M.R. §14.04.[11]
The negotiations that led to the 1992 revised Lau Plan also resulted in a significant change in the size of the high school bilingual clusters required under the Plan. The purpose of bilingual clusters is to group together in a single high school a large enough number of bilingual students with the same native tongue to permit a broader range of course offerings and faculty. Under the 1992 Plan, the size of the high clusters was *618 doubled from 100 students with five bilingual teachers to 200 students with ten bilingual teachers.
In 1998, Superintendent Payzant, apparently with the blessing of the School Department’s Legal Department, decided to abandon and subsequently ignore the revised Lau Plan. While he initially permitted Millie Ruiz Allen, the Director of Bilingual Education, to engage in formal negotiations with Master PAC about revisions to the 1992 Lau Plan, the School Department essentially ended these negotiations after Allen left that position in the summer of 1997 to become a school principal. By October 1998, not only had formal negotiations ended, but Superintendent Payzant’s staff refused to speak or work with Rom and Master PAC regarding the Lau Plan. For all practical purposes, Superintendent Payzant has attempted since 1998 to kill the Lau Plan as a “living document” and treat it as a relic of an age past, which (as he testified) is how he views it.
Rather than negotiate changes in the Lau Plan with Master PAC, Superintendent Payzant unilaterally chose to violate its provisions. Instead of abiding by the maximum 18:1 ratio of students to teachers in bilingual classes required under the 1992 revised Lau Plan, he decided to increase the ratio to 20:1, as permitted by the revised state regulation. He informed Master PAC of the increase in the student-teacher ratio he had authorized and lulled its Executive Board members into inaction by telling them that the ratio in the state regulation superseded the Lau Plan, and that the state would cut off funding for bilingual education if he kept to the 18:1 ratio in the Lau Plan. This information was inaccurate and misleading. The state regulation simply bars a school system from exceeding the maximum 20:1 student-teacher ratio; it plainly does not bar a school system from providing bilingual classes with a lower ratio.
As a result of Superintendent Payzant’s change in policy, as of January 2002, at least 126 high school and 89 middle school bilingual classes without teacher’s aides exceeded the 18:1 ratio, and 62 of the high school and 69 of the middle school classes had 21 students or more. For instance, in English High School, 27 bilingual classes had more than 18 students, and 15 of the 27 had 21 students or more. In Irving Middle School, 26 bilingual classes had more than 18 students, and 23 of the 26 had 21 students or more. The data available for elementary schools was less detailed, but still demonstrated that, as of December 2001, at least 23 bilingual classes without a teacher’s aide had more than 18 students. For instance, in Agassiz Elementary School, at least five Spanish bilingual classes had more than 18 students and no teacher’s aide; one class had 26 students. Exhibits 24-26.[12]
The high school cluster requirement set forth in the Lau Plan was also violated; Superintendent Payzant testified that he believed it made “no sense” for 200 bilingual students in a high school to be a magic number. As a result, Dorchester High School in December 2001 had 103 bilingual Haitian students with four Creole-speaking bilingual teachers; Hyde Park High School had 178 Haitian students with six Creole-speaking bilingual teachers; and West Roxbury High School had 145 Haitian students with 4.5 Creole-speaking bilingual teachers. The number of Spanish-speaking bilingual students at Dorchester High School, Charlestown High School, Brighton High School, and English High School also fell well below the 200-student minimum under the cluster rule. Exhibit 27.
The School Department has also violated its obligation under Goal 7 of the revised 1992 Lau Plan to provide Master PAC with an annual report no later than June 30 analyzing the progress made in bilingual education during the just-completed school year. The last Goal 7 Report provided to Master PAC prior to trial covered the 1998-99 school year, and, although due on June 30, 1999, was not completed until 2001. A Goal 7 Report for the 1999-2000 year was completed early this year, but was not given to Master PAC until the third day of trial. No Goal 7 Report has yet been prepared for the 2000-2001 school year. Even the Goal 7 Reports that were prepared do not comply with the requirements set forth in the revised Lau Plan, because they do not provide data broken down by school.
Most recently, the School Department is preparing to violate its obligation under Goal 6 to fund Master PAC and employ a Bilingual Parent Coordinator to work with Master PAC. Superintendent Payzant has declared his intention to eliminate the position of Bilingual Parent Coordinator and end the roughly $20,000 in funding that the School Department has been providing to Master PAC at the end of this fiscal year. The Superintendent has no intention to eliminate Master PAC, but he wishes it to consist solely of volunteers and to have no funding from the Boston Public Schools.
There is no dispute that the School Department has violated the revised 1992 Lau Plan as to student-teacher ratios, high school clusters, Goal 7 reports, and Master PAC funding. What is very much in dispute is whether the Lau Plan is a legally binding agreement that this Court should specifically enforce to remedy these four violations.
DISCUSSION
Master PAC’s Interpretation of the Agreement
Master PAC contends that the 1992 revised Lau Plan is a legally binding agreement that this Court should specifically enforce with respect to the four violations identified above concerning student-teacher ratios, high school clusters, Goal 7 reports, and Master PAC funding. According to Master PAC, when the School Committee approved the original Lau Plan through its Resolution of November 30, 1979, it en *619 tered into an agreement with Master PAC regarding bilingual education that:
represented a substantial exchange of considerationthe School Committee’s promise to implement reforms in bilingual education that went beyond the requirements of state and federal law, in return for Master PAC’s promise to forego its threatened litigation regarding bilingual education and to encourage Judge Garrity to vacate his order regarding the hiring of “other minorities”;
was indefinite in duration but, with the anticipated good faith and cooperation of both Master PAC and the School Committee, was also infinitely flexible and adaptable by recognizing the need for mutually agreed-upon revisions over time; and
if breached by the School Committee, allowed Master PAC to seek specific enforcement of the agreement from a court.
There are at least three serious problems with Master PAC’s interpretation of the agreement that resulted in the Lau Plan. First, there is plainly no termination date set forth in this agreement, so it must be understood to be indefinite in duration. Perhaps for this reason, both the November 30, 1979 School Committee Resolution and the Purpose and Statement of Responsibility section of the Lau Plan specifically observe that the agreement is subject to modification by the parties as they deem appropriate. While both the Resolution and the Plan essentially impose a good faith obligation on Master PAC and the School Department to meet periodically to attempt to reach agreement concerning necessary and appropriate modifications, neither the Resolution nor the Plan address what should happen if no agreement is reached regarding modification. Under Master PAC’s interpretation of this agreement, the School Committee, once it approved the original Lau Plan in 1979, could not amend it without the approval of Master PAC. For all practical purposes, this interpretation gives Master PAC veto power for all time over any significant changes in bilingual education in the Boston Public Schools once the original Lau Plan was approved. This Court does not believe that either the School Committee or even Master PAC contemplated in 1979 that, upon approval of the November 30 Resolution, Master PAC had obtained veto power over future changes in bilingual education for all eternity.
Master PAC contends that its veto power is not unlimited because the School Committee could be discharged from its obligations under the Lau Plan without Master PAC’s approval if the School Committee were to persuade a court to exercise its equitable authority to rescind the Plan under the doctrine of frustration of purpose or impracticability. This proposed “fix” to the problem of Master PAC’s unlimited veto power presents the second serious problem with Master PAC’s interpretation of the agreement.
Under the doctrine of frustration of purpose and the related doctrine of impracticability, performance of the contract remains possible but the expected value of performance to the party seeking to be excused:
1. has been destroyed by an unanticipated circumstance,
2. that has made performance vitally different from what was reasonably to be expected, and
3. whose risk should not fairly be placed on the party seeking to be excused.
Chase Precast Corp. v. John J. Paonessa Co., Inc., 409 Mass. 371, 374 (1991), quoting Lloyd v. Murphy, 25 Cal.2d 48, 53-54, 153 P.2d 47 (1944).[13] For the School Committee to prevail in obtaining rescission of an agreement for frustration of purpose or impracticability, it would need to surmount the formidable hurdles of proving (1) that unanticipated circumstances have arisen since the revised Lau Plan was last approved, (2) which have greatly changed the practical consequences of complying with the Plan, and (3) that this risk should not be borne by the School Committee. This inevitably would require the court to consider such matters as whether:
there have been changes in pedagogy regarding bilingual education, changes in the composition of the student population, or budget cuts imposed by the City Council that were unanticipated when the most recent Lau Plan was approved,
any unforeseen changes substantially increase the burden of School Committee compliance with the Plan, and
the risk of these unforeseen changes should be borne by the School Committee.
A court certainly could make these determinations in deciding a School Committee’s equitable claim for rescission of the agreement, but it was precisely this type of judicial intrusion into bilingual education that the School Committee had successfully wished to avoid by approving the Lau Plan in 1979. As the then-President of Master PAC wrote in March 1981 to then-Superintendent of Schools Paul Kennedy in a letter drafted by Rom:
In negotiating this document [the 1979 Lau Plan], [Master PAC] acceded to the principle repeatedly asserted by the Superintendent, Boston School Committee and others that it was far preferable that educational concerns be resolved by educators and not by lawyers, judges and federal and state agencies. It was agreed that because the courts’ and agencies’ involvement necessarily only deal at the level of remediation, education innovation and creativity would be lost were the issue of bilingual/multicultural education in the Boston Public Schools taken to other forums.
Exhibit 14 at p. 1. The November 30, 1979 Resolution approving the Lau Plan was driven in part by the *620 School Committee’s desire to demonstrate to Judge Garrity that the School Committee, not a court, should and would set educational policy regarding bilingual students. As School President Finnegan testified at trial, it had become a matter of "personal dignity” for the School Committee in 1979 to take responsibility for such matters. The School Committee, when it approved the Lau Plan, did not intend that its agreement with Master PAC would mean that bilingual educational policy could be changed only with the blessing of either Master PAC or the court.
Moreover, while Master PAC contends that the School Committee could move to modify the Lau Plan on grounds of frustration of purpose or impracticability, there is nothing in the case law that would permit a court to modify rather than rescind a private contract. “We are aware of no sound theory upon which it can be held that the court has jurisdiction to modify the terms of a valid existing contract which arose solely through the voluntary act of the parties.” Thibbits v. Crowley, 405 Mass. 222, 226-27 (1989), quoting Moore v. Moore, 389 Mass. 21, 24 (1983), which quoted Schillander v. Schillander, 307 Mass. 96, 98 (1940). Consequently, under Master PAC’s interpretation of the agreement, the role of the court when faced with a dispute regarding the Lau Plan would be either to vacate the Plan or to specifically enforce it in its entirety.
Indeed, if this Court were to accept Master PAC’s interpretation of the agreement, it would mean that it would be more difficult as a matter of law for the School Committee to rescind this private agreement than it would be to modify a consent decree. “A consent judgment is essentially a settlement agreement that is entered as ajudgment.” Thibbits v. Crowley, 405 Mass. at 226. If this private agreement had become a consent judgment, it could have been modified in accordance with Massachusetts and Federal Rule of Civil Procedure 60(b), which provides in pertinent part that “upon such terms as are just, the court may relieve a party . . . from a . . . judgment ... for the following reasons: ... (5) ... it is no longer equitable that the judgment should have prospective application.” Mass.R.Civ.P. 60(b); Fed.R.Civ.P. 60(b).[14]
In Rufo v. Inmates of the Suffolk County Jail, the United States Supreme Court considered what standard should apply to the proposed modification of a consent decree that was indefinite in duration and related to the vindication of constitutional rights. 502 U.S. 367, 383 and n.7 (1992). The Court held that a parly seeking modification of a consent decree bears the burden of establishing that “a significant change in circumstances,” either in factual conditions or in law, warrants revision of the decree, and that “the proposed modification is suitably tailored to the changed circumstance.” Id. at 383-84, 393. It specifically rejected the standard used by the District Court to evaluate the request for modification"a clear showing of grievous wrong evoked by new and unforeseen conditions." Id. at 377, 393. The standard the Supreme Court rejected is far closer to the standard used in private contract actions to discharge a contract because of frustration of purpose or impracticability.
As discussed earlier, Master PAC in 1979 raised the possibility of presenting this agreement to Judge Garrity and asking him to enter it as a consent judgment, but the School Committee refused to permit the agreement to be transformed into yet another order of that court. The agreement was specifically described as a “private agreement” to contrast it with an agreement that was intended to become an order of the court through a consent decree. Yet, if Master PAC’s interpretation of the “private agreement” were to prevail, it would ultimately be more difficult for the School Committee to persuade a court to rescind the Lau Plan as a private agreement than to modify it as a consent decree. The reason the School Committee successfully resisted the Plan becoming a. consent decree was to keep the court’s hands off of it, not to increase the School Committee’s burden in persuading a court to rescind or modify it. Consequently, this Court cannot accept Master PAC’s interpretation of the private agreement as a binding contract of indefinite duration that may be rescinded or modified only with the agreement of Master PAC or upon a finding of frustration of purpose or impracticability by a court.
The School Defendants’ Interpretation of the Agreement
The School Defendants contend that the private agreement adopted by the School Committee in its November 30, 1979 Resolution has no legal force, and is simply a pronouncement of policy by the School Committee that can be violated or ignored without legal recourse. Their interpretation of the agreement, for three reasons, is as untenable as that of Master PAC.
First, the School Defendants’ interpretation belittles the concessions that Master PAC made to obtain the agreement. It is plain from the negotiations that led to the approval of the original Lau Plan that Master PAC made significant concessions to the School Defendants in return for the School Committee’s adoption of the Lau Plan, including foregoing litigation against the School Defendants to demand compliance with all applicable laws governing bilingual education and encouraging Judge Garrity to vacate his order governing the hiring of non-black minorities. According to the School Defendants, the School Committee obtained these concessions for veiy little, because the policy concerning bilingual and multicultural education that it adopted in return c.ould be ignored or intentionally violated by the School Defendants for any or no reason at all, and there was nothing that Master PAC could do about it except file the lawsuit it had threatened.
Second, the School Defendants’ interpretation is not supported by the language of the November 30, 1979 School Committee Resolution and the Lau Plan itself. Under the School Defendants’ interpretation, *621 the November 30, 1979 Resolution contains high-minded words, but they are ultimately empty and signify nothing. While the Resolution declares that the Boston Public Schools and Master PAC “have come to certain understandings as to the scope of the Voluntary Lau Compliance Plan and its legal status and disposition,” in fact, the School Defendants now contend that no such understanding was reached, because the Plan’s “legal status and disposition” was simply that it had no legal consequence. While the Resolution declares that the “Voluntary Lau [Compliance] Plan constitutes a commitment by the Boston Public Schools” to Master PAC, in fact, the School Defendants now contend that its commitment was simply moral in quality and had no legal force. While the Resolution declares that the “Voluntary Lau Compliance Plan is a living document” and “the parties shall meet periodically ... to propose any modifications . ..,” in fact, the School Defendants now contend that they can declare the document dead and refuse to meet to discuss modifications. While the resolution was signed by the Chairperson of Master PAC and the Lau Plan itself describes itself as a private, working agreement, the School Defendants now contend that it was not an agreement at all but simply a statement of policy made after consultation with Master PAC.
Third, the School Defendants’ interpretation differs from what the School Committee understood on November 30, 1979 when it approved the Resolution adopting the original Lau Plan. As noted earlier, School Committee President Finnegan, himself an attorney, understood that they were “reaching, in effect, an agreed stipulation on a court case that is in the Circuit Court of Appeals consistent with a document that I honestly believe calls for a far-reaching commitment of the Boston Public Schools ...” While he believed the School Committee was setting educational policy concerning bilingual education by adopting the Lau Plan, he also recognized that the Committee was making a commitment to this educational policy. As he testified at trial:
[T]his is a commitment, and it’s a commitment to educational policy. And I think that’s why some people refer to it as a contract, and in some vague sense it is. It certainly is an agreement.
Essentially, President Finnegan understood that this commitment meant that the School Department would implement the policy set forth in the Lau Plan. The commitment also meant that the School Committee would not modify or repeal this policy without first attempting to resolve its differences with Master PAC.
To be sure, the School Committee did not understand this commitment to mean that future School Committees were handcuffed in matters involving bilingual education because of what the 1979 Committee had done. Indeed, the School Committee that passed the November 30, 1979 Resolution recognized that a new elected School Committee would take office in January 1980, and it did not contemplate that it had infringed upon the new Committee’s role in bilingual education by approving the Lau Plan. However, the School Committee did understand that this commitment meant that the School Department was obligated to implement the policy concerning bilingual education embodied in the Lau Plan unless and until a future School Committee voted to repeal this policy and replace it with a new one. The “living document” that the 1979 School Committee had given breath to in its Resolution could be crippled or killed by a vote of the School Committee, but it could not be allowed to die through neglect or silence.
Synthesis — This Court’s Interpretation of the Agreement
Having rejected both the plaintiffs’ and defendants’ interpretations of the private agreement that Master PAC and the School Committee first entered into on November 30, 1979, this Court must reach its own interpretation. In doing so, I look to the language of the Lau Plan and of the Resolution adopting it as School Committee policy, the historical context of the Lau Plan and the Committee Resolution, the School Committee discussions prior to its adoption, the subsequent conduct of the parties with respect to the Lau Plan, as later revised, and other evidence that sheds light on the intent of the parties, and consider all of this evidence within the context of the applicable law.
This Court finds that the Lau Plan is precisely what it says it isan agreement between Master PAC and the School Committee governing the policy of the Boston Public Schools concerning bilingual education. The Lau Plan described itself as a “private agreement” to signify that it was simply an agreement between these parties and could be modified by these same parties without the approval of any court. In other words, it was a “private agreement” that was not intended to become an order of the court through a consent judgment. It described itself as a “working agreement” because it was intended to be, as the School Committee’s Resolution declared, “a living document” that would be modified over time by agreement of the parties to meet changes in the educational needs of bilingual students, in educational theory regarding bilingual education, and in the availability of financial resources. For this reason, the School Committee’s Resolution required the parties to meet periodically to explore modifications in the agreement. Indeed, implicit in this agreement is that the parties will work together in good faith to modify the agreement before any party decides to breach it.
It is, admittedly, an unusual agreement, one that does not easily fit into any traditional theory of contract. In essence, the agreement provided that, in return for Master PAC’s promise to forego its threat of litigation and to cause Judge Garrity to vacate his order governing the hiring of non-black minorities, the School Committee promised to adopt the Lau Plan as the policy of the Boston Public Schools concerning bilingual education. While the School Defendants con *622 tend that the Lau Plan is simply a statement of policy, the history that led to its adoption as the policy of the Boston Public Schools makes it plain that, for at least two reasons, it is far more than that.
First, as School President Finnegan articulated during the School Committee meetings on November 27 and 30, 1979, the Lau Plan was part and parcel of a settlement of two legal disputesone that had reached the First Circuit regarding the hiring of non-black minorities and a second that was still in the draft complaint stage and had yet to be filed in court regarding the provision of bilingual education. If the School Defendants had not refused during negotiations, the Lau Plan could have become a consent decree by filing with Judge Garrity or another court a complaint, a settlement agreement, and a motion for the Court to approve the settlement as a consent judgment. If an early settlement had not been reached, Master PAC could have caused both of these legal claims to be prosecuted until either a final judgment was entered or a settlement was ultimately obtained that resulted in a consent decree. Such a consent decree, like the private agreement actually reached, could have been indefinite in length and gone beyond what any court could have ordered in the absence of a settlement. See Rufo v. Inmates of the Suffolk County Jail, 502 U.S. at 374-76, 389.[15] The School Committee recognized that this private agreement could have become a consent decree and been made an order of the court, enforceable by the Court under its contempt powers. The Committee also recognized that the private agreement that was reached in lieu of a consent decree had legal consequence. The Committee never defined that legal consequence and perhaps did not entirely understand it, but it recognized that the agreement’s legal consequence was less than a consent decree and more than a simple declaration of policy.
Second, the November 30, 1979 Resolution of the School Committee expressly declared that the Lau Plan was the policy of the Boston Public Schools concerning bilingual education and that it constituted a “commitment” by the Boston Public Schools to Master PAC. It was highly unusual for a document with the detail of the Lau Plan to be adopted as the policy of the School Committee. It was far more common to leave such details to the School Department. It happened here because all understood that Judge Garrity wanted formal action from the School Committee before he would vacate his order governing the hiring of “other minorities” and because the bilingual parent representatives in Master PAC wanted the School Committee itself to commit to the Plan before Master PAC would abandon its plans for litigation. The School Committee in its Resolution, therefore, did not simply adopt the Lau Plan as its policy regarding bilingual education; it went on specifically to declare that the Lau Plan “constitutes a commitment to the Bilingual Implementation Team and Bilingual Master Parent Advisory Council.” Quite plainly, the School Committee did more than set policy; it made a commitment to Master PAC regarding that policy.
In essence, the private, working agreement that the School Committee entered into with Master PAC was a commitment to a written policy known as the Lau Plan and to a process to work together with Master PAC to modify that Plan to meet changing circumstances. This commitment was not irrevocable; the School Committee could vote to repeal the Lau Plan at any time and adopt a new policy in its place. As discussed earlier, this Court does not believe that the parties intended that, in the absence of future agreement as to modification, the School Committee must continue indefinitely with a bilingual educational policy that it believed was not in the best interests of Boston schoolchildren. Nor does this Court believe that the parties intended that an order of a court was needed before the School Committee could disavow that policy commitment.[16]
Pragmatically, if the present School Committee wishes in 2002 to repeal the 1992 revised Lau Plan and institute a new policy concerning bilingual education, this Court will not require it to comply with the ten year old policy. Nor will it require the School Committee to justify to this Court the need for its repeal, either by establishing the elements of frustration of purpose or impracticability necessary to discharge a private contract or the broader standard set forth in Rufo to modify a consent judgment. The School Committee no doubt would need to justify the breach of its commitment and the repeal of this long-standing policy to the people of Boston and the parents of Boston schoolchildren, especially the parents of the roughly 9,500 children in bilingual programs, but that is as it should be.
Interpreting the agreement to be revocable does not render it either meaningless or unenforceable. To the contrary, if the School Committee does not vote to repeal the most recent revised Lau Plan, then that revised Lau Plan remains the policy of the Boston Public Schools and the School Department must implement that policy. See G.L.c. 71, §37 (school committee is responsible to establish policies for a city’s schools). If that policy is not implementedif that commitment is not met, then this Court, acting on Master PAC’s request for injunctive relief, may order compliance with that commitment. In short, under the School Committee’s private agreement with Master PAC, the School Committee may vote to repeal the Lau Plan, but it may not simply allow the School Department to violate or ignore it. The School Committee may vote to kill the Lau Plan as a “living document,” but it may not simply allow it to die. As long as the Lau Plan remains the policy of the School Committee, Master PAC is entitled to the implementation of that policy commitment, and may seek enforcement of that commitment from the court. Cf. Bates v. Director of the Office of Campaign & Political Finance, 436 Mass. 144, 175(2002) (in ordering compliance with the “Clean Elections Law” enacted through a ballot initiative, the Supreme Judicial *623 Court noted, “If the Legislature wishes not to appropriate funds for the law, it may repeal it”).
Here, there is no evidence in the record that the School Committee has ever voted to repeal the 1992 revised Lau Plan or institute a new policy in its place. Indeed, the only relevant evidence in the record demonstrates that in 1998, when the School Committee considered modifying the 1992 revised Lau Plan by increasing the Plan’s 18:1 student-teacher ratio for bilingual classes to the 20:1 permitted by state regulation, the School Committee unanimously voted to keep the ratio set forth in the Lau Plan. See Exhibit 33. Therefore, this Court finds that the 1992 revised Lau Plan continues to be the policy of the Boston Public School concerning bilingual education. This Court further finds that the policy has not been implemented by the School Department as to student-teacher ratios, high school clusters, Goal 7 reports, and Master PAC funding.
Therefore, this Court hereby enters a declaratory judgment under G.L.c. 231A declaring:
1. that the 1992 revised Lau Plan constitutes an enforceablé, but revocable, agreement between the School Committee and Master PAC,
2. that this agreement has not been revoked by the School Committee,
3. that the 1992 revised Lau Plan therefore remains both the policy of the School Committee concerning bilingual education and a policy commitment to Master PAC,
4. that the School Department has failed to implement the provisions of this agreement and policy commitment as to student-teacher ratios, high school clusters, Goal 7 reports, and Master PAC funding, and therefore,
5. that the School Defendants have materially breached its agreement with and commitment to Master PAC.
To remedy this breach, this Court orders that, effective July 1, 2002, the first day of the next fiscal year, the School Defendants shall comply with the applicable provisions of the 1992 revised Lau Plan as to student-teacher ratios, high school clusters, Goal 7 reports, and Master PAC funding unless the School Committee votes to repeal the Lau Plan as the policy of the Boston Public Schools regarding bilingual education. In short, the School Committee must either vote to repeal its policy concerning bilingual education, or it must ensure that its policy is implemented.
In view of the long and controversial history of judicial involvement in the Boston Public Schools, I am mindful of the risk that this Order will be misunderstood so let me be clear as to what this Order does and does not do. This Order does not abrogate the School Committee’s exclusive authority to set educational policy in the Boston Public Schools; it simply requires that it implement the policy commitments it has made or vote to renege upon those commitments. Nor is this Court intruding in the setting of educational policy; the only policy that this Order requires to be implemented is the policy adopted by the School Committee. Nor is this Court locking the School Committee into any particular policy regarding bilingual education; the Committee is free to vote to repeal the 1992 revised Lau Plan and enact a new policy in its place if it sees fit.[17]
Rather, this Order simply declares that, when the School Committee enters into a written agreement with a parent association to resolve threatened litigation and that agreement consists of an express policy commitment to that association, it must either implement the educational policy that comprises that agreement or vote to repeal that policy. If the School Committee fails either to implement the policy or vote to repeal it, then a court may order that the policy be implemented in accordance with the policy commitment. In essence, this Order declares that a School Committee must abide by its agreements or vote to repeal them; it cannot simply permit the School Department, whose duty is to implement the policy of the School Committee, to violate or ignore those policies.
ORDER
For the reasons stated above, this Court hereby enters a declaratory judgment under G.L.c. 231A declaring:
6. that the 1992 revised Lau Plan constitutes an enforceable, but revocable, agreement between the School Committee and Master PAC,
7. that this agreement has not been revoked or modified by the School Committee,
8. that the 1992 revised Lau Plan therefore remains both the policy of the School Committee concerning bilingual education and a policy commitment to Master PAC,
9. that the School Departmenthas failed to implement the provisions of this agreement and policy commitment as to student-teacher ratios, high school clusters, Goal 7 reports, and Master PAC funding, and therefore,
10. that the School Defendants have materially breached its agreement with and commitment to Master PAC.
To remedy this breach, this Court further orders that, effective July 1, 2002, the first day of the next fiscal year, the School Defendants shall comply with the applicable provisions of the 1992 revised Lau Plan as to student-teacher ratios, high school clusters, Goal 7 reports,[18] and Master PAC funding unless the School Committee votes to repeal the 1992 revised Lau Plan as the policy of the Boston Public Schools regarding bilingual education.

 For the sake of simplicity, this Court shall refer to the plaintiffs collectively as Master PAC. The defendants, in their motion for summary judgment, have challenged the standing of these plaintiffs. This Court denied that motion but declared its willingness to consider the issue of standing in its findings of fact. Having heard the evidence at trial, this Court finds that the plaintiffs have standing under Mass.R.Civ.P. 23.2 as representative parties of an unincorporated association since “it appears that the representative parties will fairly and *624 adequately protect the interests of the association and its members." Mass.R.Civ.P. 23.2.

 For the sake of simplicity, the Court shall refer to the defendant Boston School Committee and its members as “the School Committee.” The Court shall refer to the defendant Superintendent of Schools and the administrators of the Boston Public Schools as “the School Department.” Collectively, the Court shall refer to the defendants as “the School Defendants.”

 Lau was the name of the plaintiff in the United States Supreme Court case of Lau v. Nichols, 414 U.S. 563 (1973), in which the Supreme Court found the San Francisco, California school system to be in violation of the Civil Rights Act of 1964, 42 U.S.C. §2000d, for failing to provide English language instruction to roughly 1,800 students of Chinese ancestry who did not speak English.

 “Children of limited English-speaking ability” is a defined term in the statute, referring to “(1) children who were not born in the United States whose native tongue is a language other than English and who are incapable of performing ordinary classwork in English; and (2) children who were born in the United States of non-English speakingparents and who are incapable of performing ordinary classwork in English.” G.L.c. 71 A, 81.

 The parents of bilingual children in particular Boston Public School districts participate in a Bilingual Parent Advisory Council for that district, which is referred to as a sub-PAC. While a sub-PAC focuses on bilingual education in the particular district, the Master PAC is concerned with bilingual education throughout all the Boston Public Schools. One becomes a Master PAC member through membership in a sub-PAC. The President of the Master PAC is elected in a city-wide election in which all the sub-PACs participate.

 The name of this federal cabinet department was later changed to the Department of Health and Human Services, known by the acronym — HHS—after a separate Department of Education was established in the federal government.

 Morgan v. Finnegan, Civ. Action No. 72-911-G, was the name of the case in the United States District Court for the District of Massachusetts over which Judge Garrity presided that, among other things, ordered the desegregation of the Boston Public Schools.

 Judge Garrity had earlier issued a number of orders regarding the hiring of black teachers. The July 5, 1978 Order was the first that addressed the hiring of “other minority teachers,” which appears to have been directed to the hiring of Hispanic teachers. This Court does not know enough about Judge Garrity’s orders to understand how they dealt with Híspanles whose skin color was black.

 At the November 30, 1979 School Committee meeting, Rom observed that “this document, by our agreement, is not going to be subject to the jurisdiction of the Office for Civil Rights, as it would be if we were talking about mere compliance with Lau guidelines . . .” School Committee Meeting, Nov. 30, 1979, Exhibit 6 atp. 75.

 When this provision was read at the School Committee meeting, President Finnegan interjected, “You people ought to be very careful when drafting documents.” Superintendent Wood replied, “I’m not going to get into a legal dispute.” President Finnegan, rather presciently, responded, “You will be in a legal dispute when you sign this, though, I can assure you.” School Committee Meeting, November 30, 1979, Exhibit 6 at p. 78.

 603 C.M.R. §14.04 currently provides:
Pursuant to M.G.L.c. 71, §5, the maximum student-teacher ratio for Transitional Bilingual Education classes grades K-12 shall be an average of 20:1, except that the student-teacher ratio may be an average of 25:1, where a teacher’s aide is assigned to the class. No individual class enrollment may be larger than the largest regular education class at the same grade level(s).

 This data came from the Boston Public Schools’ own records, furnished to Master PAC during discovery. The defendants offered no evidence to refute it beyond Superintendent Payzant’s skepticism that bilingual classes could exceed the ratio in the state regulation without being grieved by the Teachers Union under the collective bargaining agreement.

 The doctrine of frustration of purpose is defined similarly in the Restatement (Second) of Contracts §265 (1981):
Where, after a contract is made, a party’s principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.
This Restatement definition is nearly identical to the Restatement definition of the doctrine of impracticability. Restatement (Second) of Contracts §261. Both definitions are nearly identical to the defense of commercial impracticability found in the Uniform Commercial Code, G.L.c. 106, §2-615 (1988 ed.), and are consistent with the common law of contracts regarding impossibility of performance. Chase Precast Corp. v. John J. Paonessa Co., Inc., 409 Mass, at 375. See Mishara Constr. Co. v. Transit-Mixed Concrete Corp., 365 Mass. 122 (1974).

 Massachusetts Rule of Civil Procedure 60(b) is identical in its wording to the federal rule.

 The consent decree in Rufo governing conditions at the Suffolk County Jail was not limited in its duration and exceeded constitutional requirements. The Supreme Court observed, “(W]e have no doubt that, to ‘save themselves the time, expense, and inevitable risk of litigation,’ petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement.” Id. at 389, quoting United States v. Armour & Co., 402 U.S. 673, 681 (1971).

 In view of this finding as to the intent of the parties to the private agreement, this Court need not consider whether a School Committee’s agreement regarding educational policy that was intended to be irrevocable may be enforceable as a matter of law. See Higher Educ. Coordinating Council v. Massachusetts Teachers’ Assn., 423 Mass. 23, 27-28 (1996); School Committee of Hanover v. Curry, 3 Mass.App.Ct. 151, 157 (1975). In these cases, the Supreme Judicial Court and Appeals Court held that a school committee or college board of trustees may not abdicate its control over matters of educational policy in a collective bargaining agreement. Id. Since in this case the School Committee’s private agreement with Master PAC was revocable, the School Committee never abdicated its control over matters of bilingual educational policy, and retained the right at any time to repeal the agreed-upon policy and institute a new policy.

 It is perhaps of political but not of legal significance that the School Committee that adopted the November 30, 1979 Resolution was elected and the present School Committee is appointed by the Mayor.

 Goal 7 of the 1992 revised Lau Plan requires that semi-annual reports be completed on December 15 and June 30 each year. Master PAC asks only that an annual report be completed on June 30, so this Court will limit its order concerning Goal 7 reports to require only that annual report.